RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0050p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

VIBO CORPORATION, INC.,
                    *Plaintiff-Appellant,*

          *v.*                                          No. 10-5043

JACK CONWAY, et al.,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 08-00571—Jennifer B. Coffman, Chief District Judge.

Argued:  October 6, 2011

Decided and Filed:  February 22, 2012

Before:  CLAY, GIBBONS, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** John K. Bush, GREENEBAUM DOLL & McDONALD PLLC, Louisville, Kentucky, for Appellant.  Gary D. Wilson, Washington, D.C., Douglas L. Wald, ARNOLD & PORTER LLP, Washington, D.C., for Appellees. **ON BRIEF:** John K. Bush, Daniel W. Redding, GREENEBAUM DOLL & McDONALD PLLC, Louisville, Kentucky, for Appellant. Gary D. Wilson, Washington, D.C., Douglas L. Wald, Michael B. Bernstein, ARNOLD & PORTER LLP, Washington, D.C., Eric Shapland, ARNOLD & PORTER LLP, Los Angeles, California, Michael Plumley, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, Irving Scher, Scott Martin, GREENBERG TRAURIG LLP, New York, New York, Charles S. Cassis, Theresa A. Canaday, FROST BROWN TODD LLC, Louisville, Kentucky, Stephen R. Patton, Douglas G. Smith, KIRKLAND & ELLIS LLP, Chicago, Illinois, Robert J. Brookhiser, Elizabeth B. McCallum, BAKER & HOSTETLER, Washington, D.C., Merrill S. Schell, M. Stephen Pitt, WYATT, TARRANT & COMBS, LLP, Louisville, Kentucky, Eric Estes, OFFICE OF THE ARKANSAS ATTORNEY GENERAL, Little Rock, Arkansas, David Lapp, OFFICE OF THE MARYLAND ATTORNEY GENERAL, Baltimore, Maryland, Brett DeLange, OFFICE OF THE IDAHO ATTORNEY GENERAL, Boise, Idaho, Paul Berks, OFFICE OF THE ILLINOIS ATTORNEY GENERAL, Chicago, Illinois, Brian D. Devlin, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Douglas A. Bahr, OFFICE

1

OF THE NORTH DAKOTA ATTORNEY GENERAL, Bismarck, North Dakota, Susan C. Walker, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, Rebekah A. Baker, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, Michael T. Weirich, OREGON DEPARTMENT OF JUSTICE, Salem, Oregon, for Appellees.

CLAY, J., delivered the opinion of the court, in which GIBBONS, J., joined. WHITE, J. (p. 23), delivered a separate concurring opinion.

---

## OPINION

---

CLAY, Circuit Judge.   Plaintiff VIBO Corporation, Inc., appeals the district court's order dismissing its antitrust claims against Defendant tobacco companies, filed pursuant to the Sherman Act, 15 U.S.C. §§ 1, 3(a); dismissing its constitutional claims against Defendant Attorneys General, filed pursuant to the Equal Protection Clause of the Fourteenth Amendment, the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Due Process, Commerce, and Compact Clauses of Article I; dismissing its request for relief from the constitutional violations, filed pursuant to 42 U.S.C. § 1983; dismissing its state common law fraud claim; and denying its motion for preliminary injunctive relief.   For the reasons set forth below, we **AFFIRM**.

## BACKGROUND

Plaintiff VIBO Corp., doing business as General Tobacco, filed a Complaint against sixteen tobacco manufacturers ("Manufacturer Defendants")[1] and fifty-two Attorneys General ("Attorneys General Defendants") acting in their official capacities,[2]

---

[1]Manufacturer Defendants are comprised of two groups of tobacco companies: three companies who were parties to the original Master Settlement Agreement contested in this suit  and thirteen companies who joined the settlement within ninety days of its execution.  These companies include Lorillard Tobacco Co.; Philip Morris USA, Inc.; R.J. Reynolds Tobacco Co.; Commonwealth Brands, Inc.; Imperial Tobacco Limited/ITL; Japan Tobacco International USA, Inc.; King Maker Marketing, Inc.; Lane Limited; Liggett Group, LLC; Lignum-2, Inc.; P.T. Djarum; Premier Manufacturing, Inc.; Santa Fe Natural Tobacco Co.; Sherman's 1400 Broadway N.Y.C., Inc.; Top Tobacco, LP; and Vector Tobacco, Inc.

[2]The Attorneys General represent forty-six states, four United States territories, the Commonwealth of Puerto Rico, and the District of Columbia.  Jack Conway, the lead named defendant, is the Attorney General of the Commonwealth of Kentucky.

alleging federal antitrust and constitutional violations and a pendent state fraud claim. On January 6, 2010, the district court entered judgment dismissing Plaintiff's claims against Defendants for failure to state a claim or lack of subject matter jurisdiction, denying as moot Defendants' other motions to dismiss, and denying Plaintiff's request for preliminary injunctive relief. *See VIBO Corp., Inc. v. Conway*, 594 F. Supp. 2d 758, 788–89 (W.D. Ky. 2009).

### A.       The Master Settlement Agreement

The claims at issue revolve around a November 1998 settlement, the Master Settlement Agreement (MSA), which was executed to end litigation between several states and the four largest tobacco companies at the time.[3]  The litigation involved the tobacco companies' advertising strategies, which allegedly misled consumers as to the harmful and addictive effects of tobacco and inappropriately targeted underage consumers.

Under the MSA, the Attorneys General of several states agreed to release their past and future claims against the tobacco companies in exchange for large settlement payments, future annual disbursements from the tobacco companies managed under an approved payment scheme, and restrictions on the companies' future advertising and marketing schemes.  The four original tobacco companies party to the MSA were known as the original participating manufacturers (OPMs).  In addition to releasing their claims against the OPMs under the MSA, Attorneys General Defendants released claims against the OPMs' suppliers, retailers, and distributors.  The release provided an incentive for these businesses to partner with OPMs rather than tobacco companies that had not joined the MSA, known as non-participating manufacturers (NPMs).

Attorneys General Defendants also wanted NPMs to join the MSA and thus be subject to its payment and marketing requirements.  Thus, the MSA outlined procedures

---

[3]The agreement was originally executed by eight state Attorneys General.  Other states joined the MSA by initiating similar litigation against the tobacco companies in their states' courts and subsequently moving the courts to approve their agreed-upon entry into the MSA and dismiss their claims with prejudice.

for NPMs to join the MSA despite not being party to the original litigation. If an NPM joined the MSA, it would become a subsequent participating manufacturer (SPM). In order to encourage the expedited entry of SPMs into the MSA, any SPM that entered the MSA within ninety days of its November 1998 execution date was "grandfathered" into the MSA and had a reduced payment obligation for its future annual payments under the payment scheme when compared with the payment obligations of non-grandfathered SPMs. However, by MSA requirement, the OPMs retained the most favorable payment terms.

In order to induce NPMs to join the MSA and in order to prevent NPMs from having a market advantage over the OPMs and SPMs that were subject to large MSA payments and marketing restrictions, the agreement permitted the states to enact "Escrow Statutes." These statutes required an NPM to make annual deposits into state escrow accounts for each state where the NPM sold its products. The escrow payment amounts were based on each company's sales in each state. The deposits were held for twenty-five years, in the event that a state obtained a future judgment or settlement from that NPM. If no judgment is obtained during that time, the deposit would be released back to the NPM. For many tobacco companies, especially those selling products in multiple states, the payment scheme under the MSA was less burdensome than the payment schedules provided in the Escrow Statutes.

If an NPM joined the MSA later than ninety days after its execution, it would be required to negotiate an MSA "adherence agreement" with the Attorneys General. After doing so, it became a non-grandfathered SPM and was subject to higher payment obligations than the OPMs and grandfathered SPMs. A "back-payment" provision required every tobacco company that joins the MSA after ninety days of its execution to make the payments to the states that it would have been obligated to make had it joined the MSA at the time of its execution. The payment amount was based on the company's nationwide sales since 1999. The company also had to make annual payments going forward, which were based on the company's national market shares. These payments were not reduced as were the grandfathered SPMs' payments. The

adherence agreement determined the back-payment amount and the annual payment obligation amount going forward.

The MSA also contained provisions to ensure that the OPMs retained favored treatment among the other participating manufacturers (PMs).  If any adherence agreement of an SPM provides for more favorable terms for that company than the terms governing the OPMs under the MSA, then a clause in Section XVIII(b) of the MSA, entitled "Limited Most Favored Nations" (LMFN), granted the OPMs the right to receive those same favorable terms.  The LMFN clause did not grant any PM the authority to vote on whether an NPM may become a party to the MSA or to determine the terms of an adherence agreement.  Other provisions in the MSA governed waiver of constitutional claims, jurisdiction, venue, and arbitration agreements.

### B.       Plaintiff Becomes a Party to the MSA

Plaintiff entered the tobacco market in 2000, two years after the MSA's execution.  Plaintiff originally operated as an NPM in a few states, including Kentucky, Florida, and North Carolina.  It paid into state escrow accounts, but the states began to amend their escrow statutes to make the escrow payments more burdensome. Ultimately, Plaintiff determined that it would be more profitable to operate as an SPM. Plaintiff joined the MSA in 2004 by negotiating its Adherence Agreement (AA) with Attorneys General Defendants.  The AA outlined Plaintiff's mandatory back-payment amount and the payment amounts it would make going forward.  These payment amounts were determined, in part, based on Plaintiff's two-percent share in the national tobacco market (the largest share among NPMs at the time).

According to Plaintiff, during negotiations for the AA, Attorneys General Defendants failed to explain the extent of the payment reductions granted to grandfathered SPMs and denied Plaintiff access to this information on the grounds that other PMs' payment arrangements were confidential.  Plaintiff also claims that it was assured that Attorneys General Defendants enforced their Escrow Statutes (thereby confirming to Plaintiff that it would be more beneficial to join the MSA) and that the

LMFN clause would not prevent Plaintiff's ability to obtain more favorable terms under the MSA if it sought to do so at a later date.

After joining the MSA, Plaintiff became dissatisfied with the disparate treatment afforded the other tobacco companies, such as the lack of back-payments for the OPMs and the reduced payment obligations available to eligible grandfathered SPMs. Plaintiff's per-carton payment obligation to Attorneys General Defendants was higher than the obligations of the OPMs and some SPMs.

Plaintiff eventually was unable to meet its back-payment obligations and its payments going forward, as was required by its AA. In an attempt to renegotiate its position under the MSA, Plaintiff sought to execute an Amended Adherence Agreement (AAA) with Attorneys General Defendants. The AAA was more favorable to Plaintiff than the AA because it lessened Plaintiff's payment obligations. According to Plaintiff, however, the AAA did not contain more favorable terms than the OPMs or grandfathered SPMs had under the MSA.

Initially, Attorneys General Defendants were willing to execute the AAA. However, the PMs learned of the proposed AAA's terms and sent written notice to Attorneys General Defendants to remind them of the LMFN clause. Specifically, the PMs noted that if the AAA contained more favorable terms than the PMs had under the MSA, the LMFN clause would be triggered and the PMs would seek to receive the beneficial AAA terms. Attorneys General Defendants requested that the PMs waive any LMFN rights that they may have if the AAA was executed, but the PMs refused to waive their rights. Based upon this knowledge, Attorneys General Defendants declined to execute the AAA with Plaintiff. As a result, Plaintiff remains a party to the MSA through its original AA.

Plaintiff initiated the present civil action alleging that Manufacturer Defendants violated two antitrust provisions of the Sherman Act by assisting with the creation of the allegedly discriminatory MSA and by invoking their allegedly baseless LMFN rights. Plaintiff also raised claims against Attorneys General Defendants, asserting that the MSA violates the Equal Protection Clause, Due Process Clause, Commerce Clause, and

Compact Clause of the United States Constitution.  Finally, Plaintiff raised a fraudulent inducement claim against Attorneys General Defendants for allegedly failing to provide Plaintiff with material information regarding the payment terms of the other PMs during its AA negotiations.

## DISCUSSION

We review *de novo* a district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted and a district court's grant of a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction.  *Frank v. Dana Corp.*, 646 F.3d 954, 958 (6th Cir. 2011) (considering Rule 12(b)(6) ruling); *EEOC v. Hosanna-Tabor Evangelical Lutheran Church & Sch.*, 597 F.3d 769, 775 (6th Cir. 2010) (considering Rule 12(b)(1) ruling).  The facts alleged by the plaintiff must be accepted as true, and those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## I.    SHERMAN ACT CLAIMS

Plaintiff challenges Manufacturer Defendants' actions under two sections of the Sherman Act, 15 U.S.C. §§ 1, 3(a).  The relevant provisions provide that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared [to be] illegal." 15 U.S.C. §§ 1, 3(a). Plaintiff alleges that Manufacturer Defendants' refusal to waive their LMFN rights, which caused Attorneys General Defendants to reject Plaintiff's proposed AAA, constituted a *per se* illegal boycott of Plaintiff, a concerted refusal to deal with Plaintiff, and the denial of Plaintiff's equal access to an essential facility, namely, the MSA.  Manufacturer Defendants assert that, regardless of the truth of Plaintiff's allegations, they are immunized from Plaintiff's antitrust claims under the *Noerr-Pennington* doctrine or, in the alternative, the state-action doctrine.

The district court found that Manufacturer Defendants were immunized under both the *Noerr-Pennington* and state-action doctrines and thus dismissed these claims under Federal Rule of Civil Procedure 12(b)(6).[4]  We agree.

## A.     *Noerr-Pennington* Immunity

Under the Petition Clause of the First Amendment to the U.S. Constitution, private actors have the right to petition the government for action.  U.S. Const. amend I ("Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances.").  Where private actors petition the government for action that would violate antitrust law, the Petition Clause immunizes the actors from litigation in connection with their petitioning.  Under these circumstances, private immunization from alleged violations of the Sherman Act is known as the *Noerr-Pennington* doctrine.  *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961).  "The doctrine is an "expression[] of the principle that the antitrust laws regulate business, not politics," and is designed to protect "citizens' participation in government." *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 383 (1991).  Thus, "'[w]here a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action,' those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (quoting *Noerr*, 365 U.S. at 136).  However, private actors remain liable for anticompetitive activity not associated with government petitioning or antitrust violations that they directly cause.  *Id.* at 501.  "The dividing line between restraints resulting from governmental action and those resulting from private action may not always be obvious." *Id.* at 501–02.

---

[4]Although the court did not address the merits of the Sherman Act claims, it did note that, with respect to the LMFN waiver claim, "it is not actually clear that the wrong alleged even falls within the scope of the Sherman Act." *VIBO Corp.*, 594 F. Supp. 2d at 775 n.13.  Because we agree that Manufacturer Defendants are immune from Plaintiff's antitrust claims, we similarly decline to address the merits of these claims.

"The Supreme Court has interpreted 'petitioning' to encompass activities other than legislative lobbying. For example, *Noerr-Pennington* immunity protects private actors when they file court documents and enter contracts with the government." *Sanders v. Brown*, 504 F.3d 903, 912 (9th Cir. 2007) (citing *Calif. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972), and *Greenwood Utils. Comm'n v. Miss. Power Co.*, 751 F.2d 1484, 1505 (5th Cir. 1985)). Petitioning also includes the acts of "negotiating and entering into settlements or other agreements with the government." *Sanders*, 504 F.3d at 912 (citing *Campbell v. City of Chicago*, 823 F.2d 1182, 1186–87 (7th Cir. 1987)). Some courts have held that a competitor's conduct of boycotting constitutes protected petitioning intended to induce government action, so long as the boycotting is not for the purposes of contracting for higher prices and does not amount to direct marketplace injury. *See Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.*, 185 F.3d 154, 157–60 (3rd Cir. 1999); *Sandy River Nursing Care v. Aetna Cas.*, 985 F.2d 1138, 1141–44 (1st Cir. 1993); *Mark Aero, Inc. v. Trans World Airlines, Inc.*, 580 F.2d 288, 296–97 (8th Cir. 1978).

Moreover, the bad intent or anticompetitive motivation of private actors seeking government action is irrelevant to the application of *Noerr-Pennington*. *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007). This is so because it is "impracticable or beyond the purpose of the antitrust laws to identify and invalidate lawmaking that has been infected by selfishly motivated agreement with private interests[, and it is likewise] impracticable or beyond that scope to identify and invalidate lobbying that has produced selfishly motivated agreement with public officials." *Omni Outdoor Adver.*, 499 U.S. at 383.

Here, Manufacturer Defendants assert *Noerr-Pennington* immunity from Plaintiff's Sherman Act claims because their involvement with the MSA and notice of their LMFN rights amounted to petitioning. Plaintiff argues that *Noerr-Pennington* does not apply because this is not a situation where Manufacturer Defendants petitioned Attorneys General Defendants for antitrust action, but rather where Manufacturer Defendants directly violated antitrust law. *See Allied Tube*, 486 U.S. at 501–02. We

disagree. Even taking Plaintiff's factual allegations as true, it is clear that the state governments' actions were the actual cause of the alleged antitrust violations. Although Manufacturer Defendants sent notice to Attorneys General Defendants that they would not waive their LMFN rights—to the extent that the AAA would trigger the LMFN clause at all—the LMFN clause itself creates no vote or veto power for the PMs; all decision-making authority rests with Attorneys General Defendants.[5] Moreover, Manufacturer Defendants' allegedly selfish motivation in refusing to waive their LMFN rights is immaterial.

Attorneys General Defendants were free to accept or reject both the MSA and the AAA, regardless of the explicit or implicit encouragement of Manufacturer Defendants. They could have executed the AAA and risked the possibility of triggering the LMFN clause, but they decided that the AAA was not worth that risk. Thus, the decision not to execute the AAA rested with Attorneys General Defendants. As the district court noted:

> Accepting all of the plaintiff's allegations as true, the plaintiff has merely alleged a classic example of a claim for which the *Noerr-Pennington* doctrine grants immunity. . . . [P]rivate actors . . . have exerted influence on the government actors; and, as a result of that influence, the government actors have declined to sign and execute the [AAA]. . . . [S]imply put, the [Manufacturer Defendants] have petitioned for, and received, certain government action that creates anti-competitive effects upon the plaintiff. Under the *Noerr-Pennington* doctrine, the defendant manufacturers are entitled to immunity for the anti-competitive effects of their successful petition for government action.

*VIBO Corp.*, 594 F. Supp. 2d at 774 (internal footnote omitted). We find this reasoning to be sound.

---

[5]Plaintiff also argues that the LMFN clause essentially granted veto power to the PMs in determining whether Plaintiff and Attorneys General Defendants could effectuate the AAA and that the PMs persuaded or coerced the Attorneys General to reject the AAA. We find no such power founded in the LMFN clause or the MSA, in general. Moreover, Plaintiff admitted that Manufacturer Defendants have "invoked" their LMFN rights on prior occasions, but that Attorneys General Defendants ignored the Manufacturer Defendants' petitioning in those instances. Plaintiff thus partially recognizes that only Attorneys General Defendants hold the decision-making power.

Plaintiff next argues that even if *Noerr-Pennington* initially applies, Manufacturer Defendants lose their immunity under the doctrine's "sham exception." The sham exception to *Noerr-Pennington* prevents the application of immunity where a defendant's act of "petitioning" was "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Omni Outdoor Advert.*, 499 U.S. at 380 (citing *Noerr*, 365 U.S. at 144). This exception "encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *Id.*; *N. Ky. Right to Life Comm., Inc. v. Ky. Registry of Election Fin.*, No. 95-6334, 1998 U.S. App. LEXIS 495, at *17–18 (6th Cir. Jan. 7, 1998); *Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992). "A 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all, not one 'who genuinely seeks to achieve his governmental result, but does so through improper means.'" *Omni Outdoor Advert.*, 499 U.S. at 380 (quoting *Allied Tube*, 486 U.S. at 500 n.4, 507 n.10) (internal citations and emphasis omitted); *Knology, Inc. v. Insight Commc'n Co., LP*, 393 F.3d 656, 658–59 (6th Cir. 2004). One "classic" example of sham petitioning is where a defendant files "frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." *Omni Outdoor Advert.*, 499 U.S. at 380.

On appeal, Plaintiff asserts that the "sham" exception applies because Manufacturer Defendants knew that the AAA did not contain more favorable terms than the PMs had under the MSA, and therefore did not trigger the LMFN clause, but the PMs nonetheless "invoked" their LMFN rights. Plaintiff undermines its argument that Manufacturer Defendants' petitioning was a sham by admitting that Manufacturer Defendants actually wanted to prevent the execution of the AAA. Thus, by Plaintiff's own admission, Manufacturer Defendants petitioned for a specific outcome from the government and succeeded; this is the precise situation that falls outside of the sham exception. *See id.*; *Noerr*, 365 U.S. at 144.

**B.     State-Action Immunity**

Although we find that Manufacturer Defendants are protected from Plaintiff's antitrust claims by *Noerr-Pennington* immunity, we also find that they are protected by the extension of state-action immunity, in the alternative.

As the Supreme Court decided in *Parker v. Brown*, principles of federalism and state sovereignty prevent state governments' liability under the Sherman Act for their allegedly anticompetitive action. 317 U.S. 341, 352 (1943); *see Omni Outdoor Adver.*, 499 U.S. at 370; *First Am. Title Co. v. Devaugh*, 480 F.3d 438, 444 (6th Cir. 2007). This doctrine is known as state-action, or *Parker*, immunity. *First Am. Title Co.*, 480 F.3d at 444. Where a state enters into an agreement with private entities and is protected by state-action immunity, that immunity extends to the private entities with whom the state deals. *S. Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56–57 (1985); *Jackson Tenn. Hosp. Co., LLC v. W. Tenn. Healthcare, Inc.*, 414 F.3d 608, 612 n.4 (6th Cir. 2005). Although Plaintiff does not raise its antitrust claims against Attorneys General Defendants, we must first determine whether Attorneys General Defendants would have immunity against such claims in order to decide whether that immunity extends to Manufacturer Defendants.[6]

**1.     State-Action Doctrine as Applied to Attorneys General Defendants**

The Sherman Act does not apply to states or state officials when acting in their sovereign capacities. *Parker*, 317 U.S. at 352. Even where the states act in conjunction with private parties, they remain entitled to immunity so long as they acted within their official capacity. *Omni Outdoor Advert.*, 499 U.S. at 374 (noting that there is also no conspiracy exception to the state-action doctrine). However, if a state acts as a "commercial participant in a given market," action taken in a market capacity is not

---

[6]When the district court ruled on the parties' motions, it was uncertain whether Plaintiff had also raised a Sherman Act violation claim against Attorneys General Defendants. The court found that, to the extent a claim was brought against the states, the states were immunized. During appellate argument, however, Plaintiff's counsel clarified that it had not brought antitrust claims against Attorneys General Defendants. Our analysis of the state-action doctrine as applied to Manufacturer Defendants requires that we consider whether the states are entitled to state-action immunity, but we do so only to adjudicate the antitrust claims against Manufacturer Defendants.

protected. Thus, "with the possible market participant exception, *any* action that qualifies as state action is '*ipso facto* exempt from the operation of the antitrust laws.'" *Id.* at 379 (quoting *Hoover v. Ronwin*, 466 U.S. 558, 568 (1984)) (internal alterations omitted).

Plaintiff alleges that Attorneys General Defendants were acting in a market participant capacity—not a sovereign capacity—in executing and enforcing the MSA and in refusing to execute the AAA. A state is a market participant when it acts "in a proprietary capacity as a purchaser or seller with regard to the challenged action" or its actions "constitute[] direct state participation in the market." *Huish Detergents, Inc. v. Warren Cnty.*, 214 F.3d 707, 714–15 (6th Cir. 2000) (quoting *White v. Mass. Council of Constr. Emp'rs, Inc.*, 460 U.S. 204, 208 (1983)) (internal citation marks omitted). A state does not become a market participant "simply because . . . [it] labels its actions as an 'agreement.'" *Huish Detergents*, 214 F.3d at 715 (examining a state's market participant status in the dormant commerce clause context); *see A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 265 n.55 (3rd Cir. 2001) (explaining the relationship of the market participant exception in dormant commerce clause jurisprudence to an assertion of state-action immunity against a claim related to the MSA).

Plaintiff does not allege any facts necessary to show that Attorneys General Defendants were acting as market participants. Plaintiff's allegation that Attorneys General Defendants were using their contractual powers when executing and enforcing the MSA is unhelpful to its claim. *See Huish Detergents*, 214 F.3d at 715. The Third Circuit considered this limited issue in a related circumstance, and noted in dicta that "[i]n joining the Multistate Settlement Agreement, the States did not enter the tobacco market as a buyer or seller, nor did they assume control or ownership of any entity within the market. . . . [T]he States' actions would not fall under the market participant exception to *Parker* immunity." *A.D. Bedell Wholesale Co.*, 263 F.3d at 265 n.55. We agree.

We hold that Attorneys General Defendants acted in their sovereign capacities, and not their market participant capacities, in enacting and enforcing the MSA and in deciding to forgo the AAA. Therefore, they are protected by state-action immunity.

### 2. State-Action Doctrine as Applied to Manufacturer Defendants

Where a state is protected by state-action immunity, that immunity extends to private entities involved in the same course of dealing. *S. Motor Carriers Rate Conference*, 471 U.S. at 56–57; *Jackson Tenn. Hosp. Co.*, 414 F.3d at 612 n.4 (noting that state-action immunity would be worthless if the private parties dealing with the immunized states were also not protected). Because we have determined that Attorneys General Defendants are clearly protected by state-action immunity in relation to the MSA, such immunity extends to Manufacturer Defendants.

Plaintiff, however, points to a refinement of the state-action doctrine articulated by the Supreme Court in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980). The Court held in *Midcal* that even where the challenged restraint is "clearly articulated and affirmatively expressed as state policy[,] . . . the policy must be actively supervised by the [s]tate itself" for state-action immunity to apply. *Id.* at 105 (internal quotation marks and citation omitted); *see also Hoover*, 466 U.S. at 568–69. In other words, even if the state authorized private parties to engage in anticompetitive behavior, immunity does not extend to the private actors unless the state retains active supervision over the private actors. *Midcal*, 445 U.S. at 105.

The district court found that it need not apply the *Midcal* test, because (1) Plaintiff did not allege that the MSA was a law or regulatory scheme arising from a clear state policy; and (2) even if the MSA was characterized as a state regulatory scheme, Plaintiff did not allege that the MSA authorizes Manufacturer Defendants to violate antitrust law. We agree. Even in its subsequent briefing, Plaintiff fails to argue the threshold issue that the MSA is a regulatory scheme that permits Manufacturer Defendants to violate antitrust law. It instead argues that Manufacturer Defendants violated antitrust law when they *misinterpreted* the MSA and their rights under the LMFN clause and acted *contrary to* or *in conflict with* state supervision. Regardless of

whether that assertion has merit, Plaintiff has confused the threshold inquiry of whether the state took action—such as passing a law, regulation, program, or other form of authorization—permitting the private actors to violate antitrust law, with the subsequent inquiry as to whether Defendants were acting within the proper scope of state supervision. Furthermore, we have already found that Attorneys General Defendants, and not Manufacturer Defendants, were the direct cause of the failed execution of the AAA. Thus, Plaintiff has not demonstrated the applicability of the *Midcal* test.

Because Manufacturer Defendants are protected by *Noerr-Pennington* immunity and state-action immunity, we find that the district court did not err in dismissing Plaintiff's Sherman Act claims for failure to state a claim upon which relief can be granted.

## II.     CONSTITUTIONAL CLAIMS

Plaintiff next raises claims against Attorneys General Defendants for violations of the Equal Protection Clause, the Due Process Clause, the Commerce Clause, and the Compact Clause. The district court dismissed Plaintiff's Equal Protection, Due Process, and Commerce Clause claims as waived under the MSA and dismissed Plaintiff's Compact Clause claim for failing to state a claim upon which relief may be granted.

### A.     MSA Section XV Waiver

Under Kentucky law, which the parties agree governs this issue, contract interpretation is a question of law, which we review *de novo. Noe v. PolyOne Corp.*, 520 F.3d 548, 551 (6th Cir. 2008); *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992). Courts interpreting contracts must look to the language of the agreement to determine the parties' intent. "When no ambiguity exists in the contract, [the court] look[s] only as far as the four corners of the document to determine that intent." *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006). Whether a contract is ambiguous—in that a reasonable person would find it susceptible to different interpretations—is also a question of law reviewed *de novo. Id.*; *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002).

Plaintiff agreed to be bound by the MSA when it signed the AA.  Section XV of the MSA addresses the possibility of constitutional claims between the parties and contains a waiver clause.  The provision states, in relevant part:

> Each Participating Manufacturer further acknowledges that it understands that certain provisions of this Agreement may require it to act or refrain from acting in a manner that could otherwise give rise to state or federal constitutional challenges and that, by voluntarily consenting to this Agreement it . . . waives for the purposes of performance of this Agreement any and all claims that the provisions of this Agreement violate the state or federal constitutions.

MSA Section XV.

Plaintiff and the district court adopted differing interpretations of this waiver provision. Plaintiff argues that the waiver only prevents it from challenging the constitutionality of MSA requirements that Plaintiff "act or refrain from acting" in a manner that may be deemed unconstitutional.[7]  Plaintiff reads the second clause (the waiver of constitutional claims) as limited by the first clause (recognition that the Plaintiff may be required to act unconstitutionally).  Plaintiff argues that the waiver does not bar its claims, because none of its constitutional claims are based on requirements that cause Plaintiff to act or refrain from acting.

On appeal, Plaintiff asserts that the district court erroneously read the waiver broadly so as to encompass all constitutional claims rather than only those claims related to requirements that Plaintiff act or refrain from acting.  However, the district court actually adopted Plaintiff's limited interpretation of the waiver clause as only applying to restrictions on Plaintiff's own actions.  *See VIBO Corp.*, 594 F. Supp. 2d at 782.  The difference of interpretation lies in the district court's broad construction of the phrase "requirements that Plaintiff act or refrain from acting" to mean "provisions that affect

---

[7]Plaintiff also claims that MSA Section XV only waives First Amendment claims because the original litigation preceding the MSA involved advertising restrictions. This claim is utterly without merit, as the waiver language clearly provides for "*any and all* claims that the provisions of this Agreement violate the state or federal constitutions" and does not signal that it applies only to First Amendment claims. MSA Section XV (emphasis added).  We look only to the plain language of the agreement to determine the parties' intent. *Abney*, 215 S.W.3d at 703.

the Plaintiff's performance under the contract" and its liberal interpretation of what requirements "affect" Plaintiff's performance. *See id.*

Under the district court's interpretation, it concluded that three of Plaintiff's four constitutional claims related to provisions that affected its performance and were thus encompassed by the waiver. Specifically, the court found that Plaintiff's Equal Protection and Due Process claims involved "[t]he MSA's unequal application of its purported back-payment requirements, grandfather exemptions and escrow requirements." *Id.* Because the alleged unequal payment scheme affected Plaintiff by imposing on it obligations higher than those of the other manufacturers, the court found that these two claims affected Plaintiff's performance and were therefore waived. In regard to Plaintiff's Commerce Clause claim, the district court found that it "involves a requirement made on the plaintiff" and thus was waived. *Id.* at 783.

We reject both of these interpretations of the waiver clause. We read Section XV more broadly than the district court and find that all constitutional claims related to the MSA are waived, even those not grounded on restrictions to Plaintiff's own actions.[8] Our interpretation is based on a close reading of the language of the two clauses in the waiver. The waiver, which is outlined in a single sentence, states that each participating manufacturer "acknowledges that it understands" two things: (1) "that" it may be required to act unconstitutionally; (2) "and that" it "waives . . . any and all" of its constitutional claims. The use of "that . . . and that" demonstrates that this sentence has two separate and equal components. Thus, the second clause is not limited by the first clause, but rather they are distinct acknowledgments. For Plaintiff to succeed on its argument that the second clause was to be limited by the first, the language of the waiver would, at the very least, need more indication that the clauses are co-dependent by using language such as "that" and "therefore" or "so." The fact that both clauses are in the same sentence does not signify that they are co-dependent. Moreover, the second clause

---

[8]Our reading of the waiver provision does not require that we interpret the phrase "act or refrain from acting" within Section XV. However, we note that the district court's interpretation of "requirements that Plaintiff act or refrain from acting" to mean "any provision that affects Plaintiff's performance" appears too broad based on a reading of the provision's plain language.

contains a clear, broad waiver that Plaintiff has waived "any and all claims that the provisions of this Agreement violate the state or federal constitutions."

### B.      Knowing, Voluntary, and Intelligent Waiver

Plaintiff argues that even if the MSA waiver applies, the waiver was not valid because Attorneys General Defendants misrepresented certain facts regarding their enforcement of the MSA and the inability to enter into the AAA without the OPMs' approval.   Specifically, Plaintiff alleges: "(1) that the plaintiff requested specific information about the extent of the exemptions granted to the grandfathered SPMs but was denied access to the information on the grounds that it was confidential . . . (2) that the plaintiff sought assurance that the Settling States were enforcing their Escrow Statutes and was so assured . . . and (3) that the Settling States represented to the plaintiff that the LMFN provision of the MSA would not affect the states' ability to grant the plaintiff entry into the MSA . . . ."[9]  *VIBO Corp.*, 594 F. Supp. 2d at 784.

For a waiver to be valid, it must be made knowingly, voluntarily, and intelligently.  *Fuentes v. Shevin*, 407 U.S. 67, 94–95 (1972).  There is a presumption against waivers of constitutional rights, which can be overcome by clear evidence "that there was 'an intentional relinquishment or abandonment of a known right or privilege.'" *Brookhart v. Janis*, 384 U.S. 1, 4 (1996) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

 Accepting Plaintiff's allegations of fraud as true, the district court found that the waiver was nevertheless knowing, intelligent, and voluntary because "[a]ny misrepresentations by the states as to how diligently [the] states were enforcing their Escrow Statutes or the impact of the LMFN clause have no relevance to the plaintiff's understanding of what rights it was giving up by signing on to the MSA." *VIBO Corp.*, 594 F. Supp. 2d at 785.  Plaintiff has not alleged that it did not understand that it was waiving its constitutional claims.  The Section XV waiver is clear, and Plaintiff is a

---

[9]These allegations also form the basis of Plaintiff's fraudulent inducement claim, analyzed *infra*.

sophisticated corporation that was represented by counsel in the course of its arms-length negotiations.  The waiver is valid.

Because Plaintiff knowingly, voluntarily, and intelligently agreed to Section XV, we find all of its constitutional claims, including its Compact Clause claim, properly dismissed as waived.

## III.    FRAUDULENT INDUCEMENT CLAIM

Finally, Plaintiff argues that the district court improperly dismissed its fraudulent inducement claim against Attorneys General Defendants.  The district court found that Attorneys General Defendants were protected by sovereign immunity, so the court lacked subject matter jurisdiction to review the claim.

The Eleventh Amendment to the U.S. Constitution grants immunity to states from litigation on state law claims in federal court.  U.S. Const. amend. XI; *Sossamon v. Texas*, 131 S. Ct. 1651, 1657–58 (2011).  A claim against a state officer acting in his official capacity is deemed to be a claim against the state for sovereign immunity purposes.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  Fraud is a state common law claim, and this action was filed in federal court.  Plaintiff concedes that Attorneys General Defendants were acting in their official capacities.  Attorneys General Defendants are thus immune from Plaintiff's allegations of fraud.

A state may, however, lose sovereign immunity where the state consents to litigation, where the state is alleged to have acted unconstitutionally, or where Congress abrogates sovereign immunity.  *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 817 (6th Cir. 2000).  In cases of consent, waiver "cannot be implied but must be unequivocally expressed."  *United States v. King*, 395 U.S. 1, 4 (1969); *United States v. White Mt. Apache Tribe*, 537 U.S. 465, 472 (2003).  Waiver occurs "if the [s]tate voluntarily invokes [federal] jurisdiction, or else if the [s]tate makes a 'clear declaration' that it intends to submit itself to [federal] jurisdiction."  *College Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 675–76 (1999) (internal citations omitted).  This is a high standard to meet, as courts "will give effect to a [s]tate's waiver

of Eleventh Amendment immunity only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 306–07 (1990) (internal citations, quotation marks, and alteration omitted).

Plaintiff claims that Attorneys General Defendants consented to litigation on matters involving the MSA and thereby waived their Eleventh Amendment immunity. On appeal, Plaintiff asserts four ways in which this occurred, none of which have merit.[10]

First, Plaintiff believes there is consent to be sued because the MSA is a contract between states, and the Supreme Court is the only forum available for disputes between states. This argument clearly fails, because the present action is not litigation between states, but between Plaintiff, which is a private party, against several states. Plaintiff next argues that consent was given since "each State consented to federal court jurisdiction to hear MSA disputes with the District of Columbia and any of the U.S. territories that is a party to the agreement because the courts in these jurisdictions are all federal courts." This argument also fails because this is a lawsuit by a private party against states, not between states and the District of Columbia or a territory. We will not extend consent to federal jurisdiction for disputes with or between other government entities to consent to federal jurisdiction for cases involving private parties.

Third, Plaintiff argues the existence of consent because the states "acknowledge the jurisdiction of the federal courts . . . through references to the United States District Courts for the Districts of Utah and Puerto Rico where the MSA was to be submitted for approval through a consent decree" per MSA Sections II(p), II(ss), VII, and XIII. We have reviewed the relevant MSA provisions and find no such consent. Furthermore, even though Utah and Puerto Rico joined the MSA by filing their consent decrees in

---

[10]We note that the MSA would have permitted the jurisdiction of the Franklin Circuit Court of the Commonwealth of Kentucky on Plaintiff's fraud claim. MSA Section VII permits jurisdiction of the "Court" over disputes, and Section II(p) defines "Court" as the court in each settling state where the consent decree was presented for approval. In this case, Kentucky's consent decree was entered by the Franklin Circuit Court on December 21, 1998. Kentucky's consent to jurisdiction in the Franklin Circuit Court obviously does not extend to the federal district court in Kentucky.

federal courts, the jurisdiction granted under Section VII only applies to the federal courts of Utah and Puerto Rico, not a federal court in Kentucky. Moreover, such alleged consent could only be deemed as consent by Utah and Puerto Rico.

Finally, Plaintiff argues that consent to be sued was expressed in MSA Section XI(c), wherein the states agreed to arbitration that "would be subject to motions to affirm or vacate in federal court under the Federal Arbitration Act." This provision is inapplicable to the present lawsuit, which is not an arbitration. We will not construe consent to federal arbitration as consent to be sued in federal court for state law claims.

Because Plaintiff has not plausibly stated that Attorneys General Defendants gave clear and explicit consent to be sued on state law claims in federal courts, it has not shown that Attorneys General Defendants waived their Eleventh Amendment immunity. The fraudulent inducement claim was therefore properly dismissed.

## CONCLUSION

For the reasons stated above, the judgment of the district court dismissing all claims against Defendants and denying Plaintiff's request for preliminary relief is **AFFIRMED**.

—————————————

**CONCURRENCE**

—————————————

HELENE N. WHITE, Circuit Judge, concurring.

I concur in the majority opinion for the reasons stated in Sections IA, II, and III.