GEOTHERMAL ENERGY CORPORATION, Appellant, v CAITHNESS CORPORATION et al., Respondents. [825 NYS2d 485]—

In an action for an accounting and to recover damages for breach of contract, the plaintiff appeals (1), as limited by its brief, from so much of an order of the Supreme Court, Nassau County (Warshawsky, J.), entered June 30, 2005, as granted that branch of the defendants' motion which was, in effect, for summary judgment declaring that a certain broker or finder's fee agreement entered into between the defendants and the plaintiff on July 23, 1980, applied only to the net cash flow generated by a single geothermal power plant known as the Navy I Plant and not to additional net cash flows generated by

three other geothermal power plants known as the Navy II Plant, the BLM East Plant, and the BLM West Plant, and denied its cross motion for summary judgment declaring that the subject agreement applied to all four geothermal power plants, and (2) from so much of an order of the same court entered October 7, 2005, as, upon reargument, adhered to its original determination.

Ordered that the appeal from the order entered June 30, 2005 is dismissed, without costs or disbursements, as that order was superseded by the order entered October 7, 2005, made upon reargument; and it is further,

Ordered that the order entered October 7, 2005 is modified, on the law, by deleting the provisions thereof which, upon reargument, adhered to so much of the prior determination as granted that branch of the motion which was for summary judgment declaring that the broker's or finder's fee agreement did not apply to additional net cash flows generated by the geothermal power plant known as the Navy II Plant, and denied that branch of the cross motion which was for summary judgment declaring that the broker's or finder's fee agreement applied to additional net cash flows generated by the geothermal power plant known as the Navy II Plant and substituting therefor provisions, upon reargument, (a) vacating so much of the order entered June 30, 2005, as granted that branch of the motion which was for summary judgment declaring that the broker's or finder's fee agreement did not apply to additional net cash flows generated by the geothermal power plant known as the Navy II Plant, and (b) denying that branch of the motion; as so modified, the order entered October 7, 2005, is affirmed insofar as appealed from, without costs or disbursements.

On December 6, 1979, California Energy Company, Inc. (hereinafter CECI), entered into a contract with the United States Navy (hereinafter the Navy contract), which, inter alia, gave CECI the right to build an electric power plant to produce a maximum of 75 Megawatts (hereinafter MW) of power using a natural geothermal resource located within a specified $3^{1}/_{2}$-square mile parcel of land in eastern California. A "Request for Technical Proposals" issued by the Navy described the project as consisting of the building of a plant producing up to 75 MW in that area, and provided that "[s]ubsequent development and delivery of power in excess of 75 MW will be negotiated under the contract Changes Clause." After entering into the Navy contract, CECI approached Wall Street financiers, including the plaintiff, Geothermal Energy Corporation (hereinafter Geothermal), seeking funding for the project.

Sometime in early 1980, the former president of Geothermal agreed to give the information package received from CECI to the former president of the defendants Caithness Corporation and Caithness Resources, Inc. (hereinafter collectively referred to as Caithness), in exchange for Caithness's agreement to give Geothermal a percentage of the net cash flow. The parties thereafter memorialized their agreement by signing a one-page letter agreement dated July 23, 1980, which had been drafted by Caithness's president (hereinafter the fee agreement). The fee agreement provided, in relevant part, that, in exchange for Geothermal having brought to Caithness the "Coso Geothermal Project, as set forth in a contract, dated December 6, 1979" between CECI and the Navy, Caithness would pay Geothermal one percent of the net cash flow from the "Coso Geothermal Project." Geothermal's right to receive payment of the fee was contingent upon Caithness entering into a "final agreement with CECI and investing equity funds to develop the Coso Project."

In December 1980 Caithness entered into a joint venture with CECI (hereinafter the CECI-Caithness joint venture), to undertake a geothermal drilling and electricity generation project under the Navy contract "as amended from time to time" within a "Project Area" consisting of "parts of the Coso Known Geothermal Resources Area which are subject to the Navy Contract or which hereafter become subject to the Navy Contract." Within a week, the Navy entered into a modification of the Navy contract to reflect that the CECI-Caithness joint venture had succeeded to CECI's interests and rights under the Navy contract.

The CECI-Caithness joint venture subsequently built a geothermal electric plant, known as the Navy I Plant, on the $3^{1}/_{2}$-square mile parcel of land referenced in the Navy contract, as it existed in December 1979. Starting in 1993, Caithness paid Geothermal amounts represented to be one percent of the net cash flow from the Navy I Plant.

In December 1981 Congress enacted a law authorizing the Navy to develop an additional four square miles within the Naval Weapons Center. Following extensive negotiations between the Navy and the CECI-Caithness joint venture, those parties entered into a further modification to the Navy contract, effective January 26, 1984, which added the additional four-square mile parcel to the land subject to development under the Navy contract. Pursuant to subsequent modifications to the Navy contract, the Navy agreed to increase the maximum amount of power that could be developed by the CECI-Caithness

joint venture from 75 MW to 160 MW and to permit the joint venture to sell excess power not required by the Navy to a utility. As a result of the 1984 modification to the Navy contract, the Navy II Plant was eventually built on the four-square mile parcel added to the original project area.

Meanwhile, in September 1981, CECI also bid for the right to lease certain parcels of land in the Coso Known Geothermal Resources Area from the Bureau of Land Management of the United States Department of the Interior (hereinafter BLM). In May 1985 CECI entered into a lease with BLM, formed another joint venture with Caithness, and assigned its interest in the BLM lease to that joint venture. The second joint venture built two more geothermal electric plants, known as the BLM East Plant and the BLM West Plant (hereinafter collectively referred to as the BLM Plants), on the lands leased by CECI from BLM.

Geothermal commenced this action claiming, inter alia, that it is entitled to receive a percentage of the net cash flow generated not only by the Navy I Plant, but also by the Navy II Plant and the BLM Plants. Caithness moved, inter alia, in effect, for summary judgment declaring that Geothermal's contractual claim is limited to a fee based on the net cash flow generated by the Navy I Plant only, and Geothermal cross-moved for summary judgment declaring that the scope of the fee agreement included not only the Navy I Plant but also the Navy II Plant and the BLM Plants. The Supreme Court determined that the fee agreement was clear and unambiguous, and declared that it was applicable to the Navy I Plant only, and not to the Navy II or the BLM Plants.

Whether a contract is ambiguous is a question of law for the court and is to be determined by looking "within the four corners of the document" (Kass v Kass, 91 NY2d 554, 566 [1998], citing W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162-163 [1990]). A contract is unambiguous if "on its face [it] is reasonably susceptible of only one meaning" (Greenfield v Philles Records, 98 NY2d 562, 570 [2002]; see Breed v Insurance Co. of N. Am., 46 NY2d 351, 355 [1978]). Conversely, "[a] contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings" (Feldman v National Westminster Bank, 303 AD2d 271 [2003] [internal quotation marks and citation omitted]; see New York City Off-Track Betting Corp. v Safe Factory Outlet, Inc., 28 AD3d 175, 177 [2006]).

The existence of ambiguity is determined by examining the "entire contract and consider[ing] the relation of the parties and the circumstances under which it was executed," with the

wording to be considered "in the light of the obligation as a whole and the intention of the parties as manifested thereby" (*Kass v Kass, supra* at 566 [internal quotation marks omitted]). The " 'intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations' " (*Del Vecchio v Cohen,* 288 AD2d 426, 427 [2001], quoting *Slamow v Del Col,* 174 AD2d 725, 726 [1991], *affd* 79 NY2d 1016 [1992]). When a term or clause is ambiguous, "the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact" (*Pellot v Pellot,* 305 AD2d 478, 481 [2003]; *see State of New York v Home Indem. Co.,* 66 NY2d 669, 671 [1985]; *Winchester Globe Trust Co. v First Secured Capital Corp.,* 288 AD2d 381, 381-382 [2001]; *Siegel v Golub,* 286 AD2d 489, 490 [2001]).

Applying these principles, we find that the term "Coso Geothermal Project," as used in the fee agreement, clearly does not refer to either of the BLM Plants. Indeed, the BLM Plants were not constructed pursuant to the Navy contract or any modification thereto, but pursuant to an entirely separate lease agreement entered into between CECI and BLM. Thus, it would be contrary to the plain meaning of the fee agreement, as well as to the parties' reasonable expectations, to interpret it as applying to either of the BLM Plants.

With respect to the Navy II Plant, however, the situation is less clear. The fee agreement can reasonably be read as being limited to the specific project undertaken pursuant to the Navy contract as it existed in December 1979, applying only the Navy I Plant. Conversely, it can also be read more broadly to include any facility built by the Caithness-CECI joint venture under the Navy contract, as amended from time to time, thereby applying to both the Navy I and Navy II Plants. While Caithness produced evidence that, at the time the fee agreement was signed, the project consisted solely of the Navy I Plant to be built on the defined land subject to Navy control and that it intended the fee agreement to be so limited, Geothermal introduced extrinsic evidence that the parties contemplated the Coso Geothermal Project as including a possible future expansion of the Navy contract to permit additional development within the Coso Known Geothermal Resources Area. Since the fee agreement is ambiguous and the parties proffered extrinsic evidence from which conflicting inferences may be drawn, the Supreme Court erred in granting summary judgment in favor of Caithness with respect to Geothermal's claim for a fee on the cash flows generated by the Navy II Plant.

Geothermal's remaining contentions are without merit. Santucci, J.P., Mastro, Fisher and Dillon, JJ., concur.