**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1819**

KELLY CAPITAL, LLC; KELLY ESCROW FUND V, LLC,

             Plaintiffs - Appellants,

         v.

S&M BRANDS, INCORPORATED,

             Defendant – Appellee,

         v.

SEI PRIVATE TRUST COMPANY, as Trustee of the SEI Private
Trust,

             Third Party Defendant - Appellant.

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.  Robert E. Payne, Senior
District Judge.  (3:10-cv-00728-REP)

Argued:  May 14, 2013                  Decided:  July 15, 2013

Before NIEMEYER, MOTZ, and FLOYD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED**:  David Barmak, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND
POPEO, P.C., Washington, D.C., for Appellants.  Bryan Michael
Haynes, TROUTMAN SANDERS LLP, Richmond, Virginia, for Appellee.
**ON BRIEF**:  Andrew Nathanson, Bridget Moorhead, Matthew Cohen,
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C., Washington,

D.C., for Appellants. Alan D. Wingfield, Timothy J. St. George, TROUTMAN SANDERS LLP, Richmond, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

I.

In 1998, the Attorneys General of forty-six states entered into a Master Settlement Agreement (MSA) with four major tobacco companies to resolve class actions that certain states had initiated against the manufacturers.  See Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 63 (2d Cir. 2007) (per curiam).  Later, to broaden the reach of the MSA, states adopted legislation, commonly known as Tobacco Escrow Statutes, requiring all tobacco manufacturers either to (1) join the MSA or (2) make annual contributions to escrow accounts for the purpose of paying tobacco-related claims.  VIBO Corp. v. Conway, 669 F.3d 675, 681 (6th Cir. 2012).  In this case, we deal with a Virginia-based tobacco manufacturer, Appellee S & M Brands, Inc. (S & M), and the contributions it made to escrow accounts.  Specifically, we consider the terms of a contract through which it sold certain interests in those contributions.

A.

Virginia law mandates that escrow contributions remain in escrow for twenty-five years and be used only to pay judgments or settlements on tobacco-related claims.  Va. Code Ann. § 3.2-4201(B).  Unused principal that remains in an account after twenty-five years reverts back to the manufacturer that placed

3

it in escrow.  Id.  Although manufacturers may invest the funds and pocket any income generated from such investments, they may not sell or transfer the fund principal.  Id.  Importantly, however, they may sell their interest in the income earned on fund investments and their reversionary interest in the principal.  See id.  Here, we term the interest in the investment income plus the reversionary interest an "escrow release."

For tax purposes, S & M's escrow accounts are classified as Qualified Settlement Funds (QSF).  A QSF has two primary characteristics:  (1) it is established via court order to "resolve or satisfy," inter alia, claims "[a]rising out of a tort, breach of contract, or violation of law," and (2) it operates as a trust such that "its assets are . . . segregated from other assets of the transferor."  26 C.F.R. § 1.468B-1(c). Additionally, in the eyes of the Internal Revenue Service (IRS), a QSF is a person.  Id. § 1.468B-2(a).  Thus, its modified gross income, such as the income generated by investment of escrowed funds, is taxed.  Id.  The impact of this policy is significant because it effectively subjects the income earned on investments of escrowed funds to a double layer of taxation—not only does the owner of the income pay taxes on what is earned, but the QSF, as a person created via regulation, does as well. Moreover, because use of the QSF principal is limited to

4

satisfaction of tobacco-related claims, the taxes must be paid from the repository of income earned.  It goes without saying that these tax regulations somewhat inhibit the sale of escrow releases associated with QSF-classified accounts.

B.

In 2009, S & M began negotiating with Appellant Kelly Capital, LLC, a private equity firm based in California, to sell its escrow releases.  From the outset, S & M communicated that the escrow accounts' QSF status subjected their income to a double layer of taxation, and Kelly Capital pursued various routes to avoid the double tax.  Most notably, it posited that

> because S & M would pay taxes on its income from the sale of its escrow releases and because Kelly would thereafter own all 'income' generated by the escrowed funds, the QSF-status of the funds (and hence the QSF-level taxes) would be eliminated upon the completion of its transaction with S & M.

Kelly Capital, LLC v. S & M Brands, Inc., 873 F. Supp. 2d 659, 666 (E.D. Va. 2012).  The idea was novel, but it gained little traction.  Indeed, early in the negotiation process, Kelly's lawyers advised it of the theory's deficiency:  "[S]ince the ownership of the account is still in the name of S & M Brands, and the QSF is a separate tax entity, the QSF should [continue to] pay taxes on earnings and transfer the remainder to Kelly

5

Capital." Id. (alterations in original) (internal quotation marks omitted).

1.

On January 21, 2010, S & M provided the first draft of an Escrow Release Transfer Agreement (ERTA) to Kelly Capital. Relevant here, section 5.02(a) required Kelly to "pay all applicable federal and state taxes, if any, required to be paid by the Purchaser with respect to the Assigned Escrow Releases, including the taxes for a Qualified Settlement Fund under the Internal Revenue Code."

On March 5, 2010, Kelly responded with a revised ERTA in which the phrase, "including the taxes for a Qualified Settlement Fund under the Internal Revenue Code" had been stricken from section 5.02(a), and an additional paragraph, section 5.01(m), had been added. Section 5.01(m) required S & M to "pay all applicable federal and state taxes, if any, required to be paid by the Seller and the Qualified Settlement Funds, including any taxes owed with respect to the Assigned Escrow Releases prior to their receipt by the Purchaser." It also provided that S & M would

> indemnify the Purchaser and its Assignees for any loss
> of Assigned Escrow Releases or Related Escrow Funds
> proximately caused by the Seller's or the Qualified
> Settlement Funds' failure to pay such liability and
> breach of this Section 5.01(m) [and that S & M Brands

6

would] promptly pay all reasonable legal and other directly related expenses incurred by the Purchaser or its Assignees in connection with any such dispute.

S & M responded on March 18, 2010, with a draft that rejected Kelly's amendments and provided instead that as to the QSF-level taxes, S & M would pay only those taxes that had "accrued on or prior to the Closing Date." It further agreed to indemnify Kelly with respect to any legal action taken in the event that S & M failed to pay such pre-closing taxes. Kelly accepted these revisions and sent an amended ERTA to S & M. The amended ERTA included the following addition to section 5.01(m):

In the event that the Internal Revenue Service or any state taxing authority makes any claim that the Seller or the Qualified Settlement Funds owe any federal or state tax liability (including any penalties or fines) with respect to the Assigned Escrow Releases or Related Escrow Funds accrued after the Closing Date, the Seller shall use its best efforts to cooperate with the Purchaser or its Assignee to defend such claim . . . . The Seller shall promptly pay all reasonable legal and other directly related expenses incurred by the Purchaser or its Assignees in connection with any such dispute as invoiced by the Purchaser or its Assignee to the Seller.

S & M rejected this addition, responding with a version that reversed the obligations of the section 5.01(m) language that Kelly had proffered. The new version replaced the last sentence of Kelly's proposed addition with a sentence requiring that "the Purchaser or its Assignee . . . promptly pay all reasonable legal and other directly related expenses incurred by the Seller as invoiced by the Seller to the Purchaser or its Assignee."

7

2.

The parties eventually finalized the deal in April 2010 with an ERTA that gave Kelly Capital or its assignees the right to purchase certain releases for thirty-four cents per dollar of principal.  Relevant here, the final ERTA included the following definitions:

> "Escrow Release(s)" means all right, title and interest in and to and all rights under the Escrow Agreement and the Tobacco Escrow Statutes with respect to (i) release of Escrowed Funds on or after twenty-five (25) years after the original deposit of each of such Escrowed Funds, (ii) interest or other appreciation earned on such Escrowed Funds, (iii) refund due to overpayment into such Escrowed Funds, and (iv) other release of all or any portion of such Escrowed Funds . . . or any earnings with respect thereto or any securities or instruments in which such Escrowed Funds are invested, together with each of the following rights which are essential for the protection and enjoyment of the foregoing: (1) the right to co-control the defense against any claims, allegations or proceedings that could result in the forfeiture, disgorgement or release of the Escrowed Funds, in whole or in part, and (b) the right to give instructions to the Escrow Agent with respect to the investment of the Escrowed Funds (provided that such investments are consistent with the Tobacco Escrow Statutes, Escrow Rules and Regulations and the Escrow Agreement) and any release of the Escrowed Funds only as described in (i) through (iv) above.

> . . . .

> "Qualified Settlement Fund" shall have the meaning set forth in the applicable Tobacco Escrow Statutes.

> "Qualified Settlement Funds" means the Qualified Escrow Funds (comprised of the Escrowed Funds (including the Related Escrow Funds)) each as classified for tax reporting purposes as a qualified settlement fund by the Internal Revenue Service

8

pursuant to a Private Letter Ruling dated January 11, 2007.

The ERTA's relevant provisions read,

### Section 2.01.  <u>Purchase and Conveyance</u>.

(a) <u>Conveyance of Escrow Releases</u>.  The Seller does hereby agree to sell, transfer, assign, set over and otherwise convey to the Purchaser . . . , without recourse, all its right, title and interest in, to and under each and every Escrow Release with respect to the related Escrowed Funds described on **Schedule B** to this Agreement and all amounts received with respect thereto and all proceeds thereof from and after the Closing Date . . . .

(b) <u>Compliance with Tobacco Escrow Statutes; Escrow Agreement</u>.  The Seller and the Purchaser hereby acknowledge and agree that notwithstanding anything contained herein to the contrary, the Related Escrowed Funds shall remain deposited with the applicable Escrow Agent . . . in the name of the Seller and be available to satisfy Released Claims in accordance with the terms and conditions of the applicable Escrow Agreement and the Tobacco Escrow Statutes.

(c) <u>Ownership</u>.  As of the Closing Date . . . the Purchaser shall become the legal and equitable owner of the Assigned Escrow Releases, and shall be entitled to all of the rights, privileges, duties and remedies applicable to said ownership. . . .

. . . .

Section 3.03.  <u>Related Documents</u>.  Concurrently herewith and as a condition for closing the transaction, the parties shall execute and deliver the Indemnity Agreement and Acknowledgement Agreement.

. . . .

Section 5.01. . . .

. . . .

9

(m) Qualified Settlement Funds. The Seller shall pay all applicable federal and state taxes, if any, required to be paid by the Seller and the Qualified Settlement Funds accrued on or prior to the Closing Date with respect to the Escrowed Funds. . . . In the event that a final determination, judgment or settlement of any dispute between the Internal Revenue Service, any state taxing authority, the Seller and/or the Qualified Settlement Funds and the Purchaser, if applicable, with respect to any federal or state tax liability (including any penalties or fines) owed by the Seller and/or the Qualified Settlement Funds accrued on or prior to the Closing Date, the Seller shall indemnify the Purchaser and its Assignees for any loss of Assigned Escrow Releases or Related Escrow Funds proximately caused bye the Seller's or the Qualified Settlement Funds' failure to pay such liability and breach of this Section 5.01(m). In addition, the Seller shall also promptly pay all reasonable legal and other directly related expenses incurred by the Purchaser or its Assignees in connection with any such dispute as invoiced by the Purchaser or its Assignees to the Seller. . . . The Seller shall use its best efforts to cause the Escrow Agent to annually deliver to the Purchaser or its Assignee a Form 1099-INT with respect to the Assigned Escrow Releases. In the event that the Internal Revenue Service or any state taxing authority makes any claim that the Seller or the Qualified Settlement Funds owe any federal or state tax liability (including any penalties or fines) with respect to the Assigned Escrow Releases or Related Escrow Funds accrued after the Closing Date, the Seller shall use its best efforts to cooperate with the Purchaser or its Assignee to defend such claim, subject to Section 5.01(e). For such disputes, the Purchaser or its Assignee shall promptly pay all reasonable legal and directly related expenses incurred by the Seller as invoiced by the Seller to the Purchaser or its Assignee.

. . . .

Section 5.02. . . .

(a) Taxes and Fees. The Purchaser shall pay all applicable federal and state taxes, if any, required

10

to be paid by the Purchaser with respect to the Assigned Escrow Releases or Related Escrow Funds received by it. The Purchaser shall pay all fees and expenses of the Escrow Agent related to the maintenance of the Related Escrowed Funds.

. . . .

Section 8.12. <u>Schedules, Annexes and Exhibits</u>. The schedules, annexes and exhibits attached hereto and referred to herein, as the same may be supplemented and amended from time to time as contemplated herein, shall constitute a part of this Agreement and are incorporated into this Agreement for all purposes.

In addition, the ERTA provided options to purchase escrow releases in the future, subject to certain timing requirements.

Finally, as noted above, section 2.01(b) requires that the Purchaser of the escrow releases comply with "the applicable Escrow Agreement and the Tobacco Escrow Statutes." Relevant here, the Escrow Agreement includes a provision that requires the Escrow Agent to "comply with all applicable tax filing, payment and reporting requirements, including, without limitation, those imposed under Treas. Reg. [section] 1.468B . . . ." As we already observed, Treasury Regulation section 1.468B stipulates that a QSF is a person subject to a tax on its modified gross income. 26 C.F.R. § 1.468B-2(a).

11

3.

Following the ERTA's execution, Kelly Capital assigned a portion of its immediate purchasing rights to Appellant SEI Private Trust Company (SEI), which purchased $30 million of escrow releases for $10.2 million. SEI is the "directed trustee" of a pension fund, and its purchases of the releases were directed by its Investment Committee, comprised only of Michael Kelly, the Chief Executive Officer of Kelly Capital, and Nick Spriggs, the former President of Kelly Capital. Kelly Capital assigned the remainder of its immediate purchasing rights to Appellant Kelly Escrow Fund V, LLC (Kelly Escrow), a special purpose vehicle that Kelly Capital had formed to purchase escrow releases. Kelly Escrow purchased $40 million of escrow releases for $13.6 million.

Soon thereafter, problems arose. "Kelly Capital sought to put together a securitization of the escrow release[s] already purchased by [Kelly Escrow] and SEI to sell interest in the package of escrow release[s] to third party purchasers." But Kelly Capital's investment bankers communicated that "the prospectus for the transaction would have to make a clear disclosure regarding the payment of the QSF taxes on the purchased escrow releases." As a result, the securitization did not move forward. Of course, such struggles motivated Kelly to continue researching options for avoiding the QSF-level taxes,

12

and it did just that, asking two different law firms to research the issue. Ultimately, however, these efforts proved unavailing.

On September 9, 2010, Kelly Capital "took the position that it was not liable for the QSF[] taxes" and communicated its view to S & M. S & M disagreed, maintaining that Kelly had "assumed the risk of the QSF-level taxation in the ERTA." On September 13, 2010, Kelly Capital sought to extend its option to purchase additional releases; thus, it sent S & M a notice to that effect. S & M communicated that it would not extend the option period unless Kelly Capital provided assurance in writing that it would pay the QSF-level taxes. Kelly Capital responded by instituting this action, together with Kelly Escrow. The complaint asked the district court to, inter alia, (1) "[d]eclar[e] that [it] ha[d] not assumed in the ERTA or the amendments to the ERTA liability or responsibility for paying the QSF-related taxes, and that such liability was not transferred by S & M under the ERTA, as amended, or otherwise"; (2) "[o]rder[] S & M to specifically perform the ERTA . . . by selling to Kelly [Escrow] the additional income and remainder interests as to which it ha[d] indicated its intention to purchase"; (3) "preserv[e] Kelly [Escrow's] options to purchase additional income and remainder interests in the future in accordance with the ERTA"; and (4) "enjoin[] S & M from selling

13

the additional interests to another buyer without first allowing Kelly [Escrow] to do so in accordance with the ERTA . . . ."

S & M responded with counterclaims against Kelly Capital and Kelly Escrow, also naming SEI as a defendant to these claims. S & M sought, inter alia,

> a declaratory judgment that Kelly Capital's . . . interpretation of the ERTA, the Escrow Agreement and associated documents [was] incorrect, that Kelly Capital . . . [was] obligated to pay, or to allow to be paid, all federal and state income taxes on the assigned Escrow Release(s), and that S & M Brands ha[d] no obligation to pay such taxes; [and]

> a declaratory judgment that it [was] not in default under the ERTA, the Escrow Agreement[,] and associated documents, and that Kelly Capital . . . committed a material anticipatory breach of its ERTA, the Escrow Agreement and associated documents, thereby releasing S & M Brands from any remaining obligations under the ERTA, including as to the transfer of additional Escrow Release(s) pursuant to the Option.

The parties conducted discovery and filed cross-motions for summary judgment. The district court denied the motions and, in so doing, concluded that the ERTA was ambiguous. Therefore, during a three-day bench trial, the court consulted parol evidence and determined that Kelly Capital had obligated itself to pay the QSF-level taxes. The court also concluded that when Kelly Capital communicated to S & M that it "was not liable for the QSF[] taxes," it committed a material anticipatory breach. Accordingly, the court released S & M from "all further obligation[] . . . to transfer additional escrow releases

14

pursuant to the option provision of the [ERTA]." Kelly Capital, 873 F. Supp. 2d at 680.

Kelly Capital, Kelly Escrow, and SEI (collectively, "Kelly Capital" or "Kelly") appeal the district court's order, contending that it erred in concluding that Kelly Capital (1) obligated itself to pay the post-closing QSF-level taxes and (2) anticipatorily breached the ERTA. For the reasons that follow, we affirm the district court's decision.

II.

Per the terms of the ERTA, New York law applies in this case. Under New York law, "whether or not a writing is ambiguous is a question of law to be resolved by the court," W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990).

"A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170–71 (N.Y. 2002) (alteration in original) (quoting Breed v. Ins. Co. of N. Am., 385 N.E.2d 1280, 1282 (N.Y. 1978)). Said differently, "If the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter

15

the contract to reflect its personal notions of fairness and equity." Id. at 171; cf. US Oncology, Inc. v. Wilmington Trust FSB, 958 N.Y.S.2d 47, 48 (N.Y. App. Div. 2013) ("A contract is ambiguous when 'on its face [it] is reasonably susceptible of more than one interpretation'" (alteration in original) (quoting Chimart Assoc. v. Paul, 489 N.E.2d 231, 233 (N.Y. 1986))). Furthermore, "[e]xtrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous." Greenfield, 780 N.E.2d at 170.

Both parties assert that the ERTA unambiguously supports their respective positions. Kelly maintains that the ERTA reflects no "affirmative assumption" on its part of a duty to pay the QSF-level taxes. S & M counters by citing portions of the ERTA that in its view "make[] clear . . . that Kelly assumed the burden of all QSF-level taxes after closing." We agree with S & M.

A.

As is evident from our recounting above, the correspondence, ERTA drafts, and other documentation associated with negotiation of the final contract is extensive. Even a cursory review reveals that much wrangling occurred regarding which party would pay the post-closing QSF-level taxes. Thus, it is somewhat surprising that, as the district court

16

recognized, "[N]owhere in any of the[] [ERTA] provisions does either party agree expressly to pay the QSF-level taxes." Kelly Capital, LLC, 873 F. Supp. 2d at 671. Such absence tempts us to immediately rule the ERTA ambiguous as to this issue and resort to parol evidence. But our initial focus in determining ambiguity must concern the contractual language that exists, not the language that is absent. And if the language is "reasonably susceptible of only one meaning," we must accord it such meaning. See W.W.W. Assocs., Inc., 566 N.E.2d at 642 ("[E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is . . . unambiguous upon its face." (quoting Intercontinental Planning v. Daystrom, Inc., 248 N.E.2d 576, 580 (N.Y. 1969)) (internal quotation marks omitted)). Thus, despite the ERTA's failure to assign responsibility for the QSF-level taxes by actually using the term "Qualified Settlement Fund" in that context, we believe that it unambiguously places the responsibility for payment of these taxes with Kelly Capital.

According to section 2.01(c), when Kelly Capital signed the ERTA, it "bec[a]me the legal and equitable owner of the Assigned Escrow Releases" and, as such, became "entitled to all of the rights, privileges, duties and remedies applicable to said ownership." One duty, as outlined in section 2.01(b), is compliance with the "terms and conditions of the applicable

17

Escrow Agreement." And the Escrow Agreement requires the Escrow Agent to "comply with all applicable tax filing, payment and reporting requirements, including, without limitation, those imposed under Treas. Reg. [section] 1.468B." It seems to us that as to the issue here, these sections are "reasonably susceptible of only one meaning"—namely, that purchasing the escrow releases includes an assumption of the duty to pay the QSF-level taxes—i.e., the taxes "imposed under Treas. Reg. [section] 1.468B." But if these sections leave doubt as to such a conclusion, sections 5.01(m) and 5.02(a) provide clarification.

Section 5.01(m) states, "The Seller shall pay all applicable federal and state taxes, if any, required to be paid by the Seller and the Qualified Settlement Funds accrued on or prior to the Closing Date with respect to the Escrowed Funds." Thus, it implies that S & M will not pay the required taxes after closing and begs the question of which party will. Section 5.02(a) answers that question: "The Purchaser shall pay all applicable federal and state taxes, if any, required to be paid by the Purchaser with respect to the Assigned Escrow Releases or Related Escrow Funds received by it." It is true that section 5.02(a) omits the term "Qualified Settlement Funds" while section 5.01(m) includes it. Although we find this curious, we do not think that it renders the contract ambiguous

18

as to the payment of the QSF-level taxes.  Section 5.02(a) makes clear that the purchaser must pay all required "applicable federal and state taxes," and as stated earlier, the Escrow Agreement, with which the purchaser must comply, requires payment of taxes "imposed under Treas. Reg. [section] 1.46B." In short, although we recognize that the contract does not assign responsibility for the QSF-level taxes by explicit use of the term, we do not think that read as a whole it is susceptible to more than one meaning on this point.

B.

In spite of our conclusion that the ERTA unambiguously assigns responsibility for the QSF-level taxes to Kelly Capital, we note for the sake of argument that even if we were to find the contract ambiguous, Kelly would fare no better.  "When a term or clause is ambiguous, 'the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact.'" Geothermal Energy Corp. v. Caithness Corp., 825 N.Y.S.2d 485, 489 (N.Y. App. Div. 2006) (quoting Pellot v. Pellot, 759 N.Y.S.2d 494, 497 (N.Y. App. Div. 2003)).  Here, the extrinsic evidence indicates the parties' intent that Kelly assume the QSF-level tax obligations upon closing.

From the beginning of the negotiations, Kelly understood that it would be responsible for the QSF-level taxes. Indeed, the record indicates that S & M communicated that fact early in the process, such that Kelly was compelled to seek legal advice regarding avoidance options. Furthermore, section 5.01(m) of the ERTA indicates S & M's intent to assist Kelly practically, by "caus[ing] the Escrow Agent to annually deliver" tax forms, should the IRS pursue it regarding the tax obligations. It also delineates Kelly's agreement to reimburse S & M for expenses incurred as a result of such assistance. As the district court aptly noted, "If Kelly did not believe that it, not S & M, was responsible for the QSF-level taxes, why would it agree to indemnify S & M for its 'cooperation' in opposing efforts by the IRS to collect those taxes from Kelly?" Kelly Capital, LLC, 873 F. Supp. 2d at 674. Finally, Kelly's post-closing conduct reveals that it believed it was responsible for the taxes. Not only did it continue researching methods of avoiding the QSF-level taxes; it failed to communicate to potential investors the point it so adamantly argues here—namely, that S & M would pay the taxes. "If Kelly had believed that S & M was obligated by the ERTA to pay the QSF-level taxes, it simply could have so said in its disclosure to investors." Id. at 675. But it did not. And its decision not to do so belies its claim against responsibility here.

20

Because the district court rested its decision on a finding of ambiguity, it addressed the intricacies of the parol evidence in much greater depth than we do here. We think it of some import to note, however, that in its brief to this Court, Kelly Capital does not contest the evidence on which the district court relied. Rather, it simply contests the district court's determination of ambiguity and the methods by which it made that determination. Because our discussion of this issue rests on an assumption of ambiguity for the sake of argument only, we need not address Kelly's allegations in this regard.

III.

Kelly also takes issue with the district court's determination that it committed a material anticipatory breach of the ERTA when it communicated to S & M that "it was not liable for the QSF[] taxes." "Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243, 258 (2d Cir. 2002) (applying New York law); see also De Lorenzo v. Bac Agency Inc., 681 N.Y.S.2d 846, 908 (N.Y. App. Div. 1998) (indicating that repudiation occurs when one party "has indicated an unqualified and clear refusal to perform with respect to the entire contract."). "The doctrine of

21

anticipatory repudiation entitles the nonrepudiating party to immediately claim damages for a breach of contract where there is a renunciation of the contract in which the repudiating party has indicated an unqualified and clear refusal to perform with respect to the entire contract." De Lorenzo, 681 N.Y.S.2d at 907–08.

Here, Kelly's indication that "it was not liable for the QSF[] taxes" constituted repudiation of the contract. Kelly maintains otherwise, averring that it "indicated its readiness to perform the entire contract, subject only to a judicial declaration of a particular element of the parties' obligations." We disagree. Regardless of whether Kelly was ready to "perform the entire contract," its determination not to pay the QSF-level taxes was a declination of material consequence. "[A] 'material breach' is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract." 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2007) (footnotes omitted); see also Callanan v. Powers, 92 N.E. 747, 752 (N.Y. 1910) (counseling that rescission of a contract in the context of repudiation is reserved for breaches that are willful or "so substantial and fundamental as to strongly tend to defeat the object of the parties in making

22

the contract"). S & M testified at trial that Kelly knew it was responsible for the QSF-level taxes and that S & M would not have entered into the ERTA unless it believed Kelly had assumed the QSF tax burden. The district court found this testimony credible, and we find no reason to conclude otherwise. Accordingly, Kelly's failure in this regard was material and constituted a repudiation of the contract. Given such repudiation, S & M was entitled to terminate its own performance. Consequently, we affirm the district court's decision as to this point.

IV.

For the reasons above, we affirm the decision of the district court.

AFFIRMED

23