141 T.C. No. 16

UNITED STATES TAX COURT

VIDAL SURIEL, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 367-12.                           Filed December 4, 2013.

P's wholly owned S corporation, V, claimed deductions for unpaid obligations, both principal and interest, owed into the Tobacco Master Settlement Agreement (MSA) fund, which is a qualified settlement fund under I.R.C. sec. 468B. R disallowed the deductions on the basis that economic performance did not occur until payment was actually made into the MSA fund, pursuant to sec. 1.468B-3(c)(1), Income Tax Regs. Under I.R.C. sec. 1366 R made adjustments to P's individual income tax returns and determined deficiencies in P's income tax.

<u>Held</u>: V is not entitled to deductions for unpaid MSA obligations, because economic performance does not occur until the obligations are actually paid. <u>See</u> sec. 1.468B-3(c)(1), Income Tax Regs.

<u>Held</u>, <u>further</u>, because the special rules governing qualified settlement funds do not differentiate between interest and principal, we afford them equal treatment.

Held, further, we sustain R's deficiency determinations.



Edward T. Yevoli, Paul D. Turner, and Joey M. Lampert, for petitioner.

Robert M. Ratchford and Jeffrey B. Fienberg, for respondent.



GOEKE, Judge:  Respondent determined deficiencies in petitioner's Federal income tax as follows:

| Year | Deficiency |
|------|------------|
| 2004 | $33,912,933 |
| 2006 | 5,837,489 |

Respondent's determinations of tax deficiencies result from adjustments made following respondent's examination of returns of Vibo Corp., d.b.a. General Tobacco, Inc. (Vibo),[1] an S corporation, because pursuant to section 1366[2] all of

---

[1]General Tobacco, Inc., is another subch. S corporation wholly owned by petitioner during the years in issue that was incorporated in the State of Florida on July 6, 2000.  Because General Tobacco is the "d.b.a. name" of Vibo, and the parties use these two names interchangeably, we will refer to them collectively as Vibo throughout this Opinion to alleviate any confusion.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

the deductions and losses of Vibo properly passed through to petitioner as the sole shareholder during each of the tax years in issue.

The issues in dispute concern Vibo's accrual of unpaid obligations incurred when it settled with 46 States, the District of Columbia, the Commonwealth of Puerto Rico, and 4 U.S. territories (collectively, settling States) by entering into the Tobacco Master Settlement Agreement (MSA). After respondent's concession,[3] the issues for decision are:

(1) whether Vibo properly deducted its MSA payment obligations under section 461(h) before those obligations were actually paid into the MSA escrow account established at Citibank. We hold that it did not;

(2) whether accrued interest owed into a qualified settlement fund is deductible in the tax year before actual payment is made. We hold that it is not; and

(3) whether adjustments to income or tax should be made with respect to petitioner's 2004 and 2006 Forms 1040, U.S. Individual Income Tax Return, as a

---

[3]Respondent concedes that petitioner reasonably and in good faith relied upon tax professionals in reporting Vibo's deductions of $302,221,719 for the 2004 tax year and thus is not liable for any accuracy-related penalty under sec. 6662(a). Respondent did not determine a sec. 6662 penalty for the 2006 tax year.

result of the adjustments made to Vibo's 2004-06 Forms 1120S, U.S. Income Tax Return for an S Corporation. We hold that they should be made.

FINDINGS OF FACT

Some of the facts have been stipulated for trial under Rule 91. The stipulation of facts and the attached exhibits are incorporated by this reference and are found accordingly.

I.      Background

Respondent mailed a notice of deficiency to petitioner on October 6, 2011. Petitioner timely filed his petition with this Court on January 4, 2012. At the time the petition was filed, petitioner was a resident of Miami, Florida. The parties have stipulated that venue for purposes of an appeal is in the Court of Appeals for the Eleventh Circuit.

A.      Vibo

Vibo, a Florida corporation, began to sell cigarettes in the United States in 1999. During 2000-2006, Vibo was taxed under subchapter S and wholly owned by petitioner. Vibo was an accrual method taxpayer during the tax years 2004-06. For each of the tax years in issue, Vibo filed a Form 1120S. During the tax years at issue, Vibo did not own any cigarette manufacturing or packaging equipment.

B.    Protabaco

Productora Tabacalera De Colombia S.A. (Protabaco), a Colombian company, is unrelated to petitioner by ownership.  During the tax years in issue, Protabaco was in the business of manufacturing tobacco products.  During the tax years in issue, Protabaco was the fabricator of Vibo's cigarettes.  As part of its entry into the MSA, Vibo entered into an exclusive manufacturing and distribution agreement with Protabaco, whereby Vibo appointed Protabaco as its exclusive manufacturer and Protabaco appointed Vibo its exclusive importer.

II.    Tobacco Master Settlement Agreement (MSA)

A.    Background

Before the MSA was executed various States either had commenced or were expected to commence litigation in order to assert claims for monetary, equitable, and injunctive relief against certain tobacco product manufacturers and other defendants for damages under State laws.  Relief and damages were sought under State laws such as consumer protection or antitrust in order to further the States' policies regarding public health, including policies to reduce smoking by youth.  The central purpose of the MSA was to reduce smoking--particularly youth smoking--in the United States.

On November 23, 1998, the MSA execution date, four tobacco product manufacturers (TPMs) entered into the MSA with representatives (the NAAG)[4] from the settling States. The four manufacturers were Brown & Williamson Tobacco Corp., Lorillard Tobacco Co., Phillip Morris, Inc., and R.J. Reynolds Tobacco Co. The settling States included 46 States, the District of Columbia, the Commonwealth of Puerto Rico, and 4 U.S. territories.

A TPM as defined in the MSA is an entity that after the MSA execution date directly (and not exclusively through any affiliate):

(1) manufactures Cigarettes anywhere that such manufacturer intends to be sold in the States, including cigarettes intended to be sold in the States through an importer * * *;

(2) is the first purchaser anywhere for resale in the States of cigarettes manufactured anywhere that the manufacturer does not intend to be sold in the States; or

(3) becomes a successor of an entity described in subsection (1) or (2) above.

Amendment No. 24 (amendment 24) to the MSA provides:

In addition, and in consideration for the above, * * * [Vibo] shall be considered to be a * * * [TPM] and a Participating Manufacturer, and Protabaco shall not be considered to be a * * * [TPM].

---

[4]The National Association of Attorneys General (NAAG) is an association of U. S. attorneys general whose tobacco project's mission is to support the States in enforcing, defending, and administering the MSA.

A participating manufacturer as defined in the MSA is a TPM that is or becomes a signatory to the MSA, provided that: (1) in the case of a TPM that is not an original participating manufacturer (OPM) (i.e., in Vibo's case), that TPM is bound by the MSA in all settling States in which the MSA binds OPMs, and (2) in the case of a TPM that signs the MSA after the MSA execution date (i.e., also in Vibo's case), that TPM, within a reasonable time after signing the MSA, makes any payments that it would have been obligated to make in the intervening period had it been a signatory as of the MSA execution date.

Under the MSA, the settling States released a participating manufacturer from all past and future tobacco-related claims that the States might have against that company, when the participating manufacturer became a signatory to the MSA. The MSA specifies two types of participating manufacturers: an OPM and a subsequent participating manufacturer (SPM). The OPMs consisted of the four TPMs, discussed <u>supra</u>, that signed the MSA on the MSA execution date. An SPM is a TPM (other than an OPM) that: (1) is a participating manufacturer, and (2) is a signatory to the MSA, regardless of when that TPM became a signatory to the MSA.

In consideration for the released claims, the participating manufacturers were required to make MSA payments to the settling States in order to promote

educational programs tailored to preventing smoking and to compensating the States for healthcare costs incurred from the effects of smoking and tobacco use. Both the released claims and the MSA payments will be discussed in turn.

B. Released Claims

Section XVIII(d) of the MSA provides: "All payments to be made by the Participating Manufacturers pursuant to this Agreement are in settlement of all of the settling States' antitrust, consumer protection, common law negligence, statutory, common law and equitable claims for monetary, restitutionary, equitable and injunctive relief alleged by the settling States with respect to the year of payment or earlier years".

C. MSA Payments

Section IX(a) of the MSA, titled "Payments", provides that all payments made pursuant to the MSA (except those not at issue in this case) shall be made into escrow pursuant to the escrow agreement. The second and third sentences of section 6 of the escrow agreement provide:

> The escrow established pursuant to this Escrow Agreement is intended to be treated as a Qualified Settlement Fund for Federal tax purposes pursuant to Treas. Reg. § 1.468B-1. The Escrow Agent shall comply with all applicable tax filing, payment and reporting requirements, including, without limitation, those imposed under Treas. Reg. § 1.468B * * *.

The OPMs and SPMs are required under the MSA to make their payments to the settling States into an escrow fund. The parties stipulate that the MSA escrow fund is a qualified settlement fund under section 1.468B-1, Income Tax Regs. The escrow fund was established with Citibank, N.A., which served as the escrow agent.

III. Pre-MSA

Tobacco manufacturers that do not join the MSA are known as nonparticipating manufacturers (NPMs). The MSA directed each settling State to enact legislation that would require an NPM to make deposits into an escrow account to satisfy any judgments that a particular State might bring against the NPM in that particular State. These statutes required an NPM to make annual deposits into State escrow accounts for each State where the NPM sold its tobacco products. The escrow payment amounts were based on each company's sales in the respective State.

The exclusive manufacturing and distribution agreement states in its recitals:

> WHEREAS, manufacturers of cigarettes sold in the United States are obligated under the laws of various U.S. states to either (i) join the * * * [MSA] or (ii) to establish and contribute funds to designated escrow accounts, which funds are intended to be made available for the settlement of tobacco-related litigation that may be brought

against such cigarette manufacturers by authorities in those U.S. states;

Because Protabaco manufactured cigarettes that were sold in the United States, it had an obligation to either join the MSA or contribute to the NPM escrow accounts, of which it chose the latter. Protabaco's name was on the NPM escrow accounts, but Vibo made the account contributions. Once Protabaco chose the NPM route, there was no obligation to later join the MSA.

The NPM escrow statutes, as originally enacted by the settling States, contained an unintended loophole that gave NPMs an unfair competitive advantage over TPMs participating in the MSA. To close this statutory loophole, in late 2003 the NAAG adopted a resolution supporting allocable share legislation, which made the passage of such corrective legislation its number one legislative effort in 2004. On March 30, 2004, Vibo submitted to the NAAG its application to join the MSA.

In a Federal antitrust action, Vibo sued the settling States, the OPMs, and other SPMs in the matter of Vibo Corp. v. Conway, 669 F.3d 675 (6th Cir. 2012). In its complaint, Vibo alleged that the MSA violated its constitutional rights and imposed an unreasonable restraint on trade in violation of antitrust laws and that it

was fraudulently induced by the settling States to join the MSA.  Vibo's claims were dismissed and judgment was entered in favor of the defendants.

Vibo further alleged that the settling States' amendment of their escrow statutes made it increasingly difficult for Vibo to continue in business under the obligation of making NPM contributions.  Vibo also stated that it came to understand that the only effective means to reach the vast majority of the national cigarette market was to join the MSA because most retail chains wanted the liability release afforded by the MSA to participating manufacturers and refused to carry Vibo products without it.  That complaint was verified by J. Ronald Denman, Vibo's vice president and general counsel.

The exclusive manufacturing and distribution agreement petitioner signed states:  "[Vibo] has agreed to make a considerable long term investment wherein it has obligated itself to make payments to the States * * * in order that it may become a signatory to the MSA, with the expectation of gaining a considerable increase in market share for the [Vibo] Cigarettes".

IV.    Entering Into the MSA

Before Vibo entered into the MSA, it fulfilled all of the NPM escrow statute deposit requirements.  On August 19, 2004, effective as of July 1, 2004, petitioner

executed the MSA on behalf of Vibo. The first paragraph of the MSA execution statement, which petitioner signed under oath, states:

> [the] undersigned authorized representative hereby executes the * * * [MSA], as amended (hereafter "Agreement") on behalf of * * * [Vibo] thereby becoming * * * [an SPM]. * * * [Vibo] and its authorized representatives agree to be bound by such Agreement and to fulfill all the obligations of a Participating Manufacturer under the Agreement, including, but not limited to, making all payments that it would have been obligated to make had it been a signatory as of the MSA execution date.

As the MSA was originally drafted, only a TPM could enter the MSA as a participating manufacturer. The MSA was later amended by amendment 24 to allow the exclusive importer of cigarettes manufactured by another person outside the United States to enter the MSA. Vibo's application to join the MSA was submitted on that basis. By signing and executing amendment 24, petitioner agreed and acknowledged that Vibo was liable to make the MSA payments on its cigarettes regardless of the identity of their manufacturer.

If an NPM joined the MSA, it would become an SPM and be subject to the MSA obligations of an SPM and a participating manufacturer. If an NPM joined the MSA more than 90 days after its execution, as Vibo did, it was required to: (1) make payments to the States that it would have been obligated to make had it joined the MSA in November 1998 (prior obligation); and (2) make annual

payments going forward based on the company's national market share (current obligation). Once a party becomes a signatory to the MSA, it no longer has an NPM escrow statute deposit obligation under a settling State's NPM escrow statute.

According to the General Tobacco adherence agreement, Vibo was required to make prior obligation payments based on the amount of Federal excise taxes that it had paid for cigarettes from January 1, 2000, through June 30, 2004. Vibo was required to make these payments in 12 annual instalments from 2005 through 2016. After application of all of the NPM escrow account amounts and other credits, the net unpaid prior obligations totaled $242,314,534 as of June 30, 2004.

Vibo was required to make current obligation payments for all obligations arising from its market share of cigarettes it sold for the period July 1 through December 31, 2004 and for all post-2004 sales. Vibo's current obligations were payable on April 15 of the year following the year in which Federal excise taxes were collected on its cigarettes.[5] Vibo's 2004 current obligation amount due on April 15, 2005, totaled $65,854,272. The General Tobacco adherence agreement

---

[5]The General Tobacco adherence agreement required Vibo to make quarterly payments into escrow towards its current obligations based upon a fixed amount per cigarette. These quarterly payments were held by SunTrust Bank in Miami, which would then transfer those funds to the Citibank escrow account on the following April 15.

spells out that Vibo is the only party with MSA payment obligations. Nothing in the MSA documents places this payment obligation on Protabaco. Protabaco was not a signatory to this agreement, the MSA execution statement, or amendment 24.

Vibo had a strong economic incentive to make its prior and current obligation payments into the MSA escrow account. If Vibo failed to make those payments, Vibo's cigarette brands would end up delisted and retailers would not stock their shelves with those brands.

V.    Vibo's Deductions

A.    Cost of Goods Sold Deductions

On its 2004 Form 1120S, Vibo deducted $295,549,083 of its MSA payment obligations (both prior and current obligations) as part of its cost of goods sold. None of this amount was actually paid into the MSA escrow account in 2004.

On its 2006 Form 1120S, Vibo deducted $108,487,225 of its MSA current obligation as part of its cost of goods sold. In 2006 Vibo paid $97,637,716 of its MSA current obligation.

B.    Interest Deduction

On its 2004 Form 1120S, Vibo deducted $4,661,190 as interest. This represented interest accrued on, and made part of, Vibo's prior obligation, for July 1 through December 31, 2004. The interest amount was calculated by and

confirmed in the letter drafted by Pricewaterhouse Coopers (PwC), the internal auditor under the terms of the MSA. No part of the $4,661,190 was paid in 2004, but this amount was paid on September 1, 2005.

The PwC letter did not calculate or confirm an interest amount attributable to the prior obligation owed for the period January 1, 2000, through June 30, 2004.

C.      Other Deduction

On its 2004 Form 1120S, Vibo deducted $2,011,446 under "Other Deductions", and it was specifically labeled "MSA Obligation--Paid." No part of that $2,011,446 was paid in 2004.

OPINION

I.      Burden of Proof

Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner in a notice of deficiency are incorrect. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deductions. Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Petitioner has not argued that respondent bears the burden of proof with respect to the issues discussed below.

II.    The Danielson Rule

A.    Danielson Applies

When a taxpayer casts a transaction in a certain form, the Commissioner may bind the taxpayer to that form for tax purposes. See Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965). The Danielson rule is a parol evidence rule applicable in Federal tax controversies. Id. at 779. Under the Danielson rule, as adopted by the Court of Appeals for the Third Circuit:

> [A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.

Id. at 775.

The Court of Appeals for the Eleventh Circuit, to which an appeal in the instant case would lie, see sec. 7482(b)(1)(A), has accepted the Danielson rule, see Plante v. Commissioner, 168 F.3d 1279, 1280-1281 (11th Cir. 1999), aff'g T.C. Memo. 1997-386; Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984). Accordingly, if the Danielson rule applies, we will follow it. Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

Petitioner's pretrial memorandum challenged the application of <u>Danielson</u>. On brief, however, he agreed that the <u>Danielson</u> rule applies to the MSA documents.

B.    <u>MSA Documents</u>

Although the parties agree that <u>Danielson</u> applies to the "MSA documents", they appear to disagree over which documents that term covers.[6] The only disagreement appears to be whether the MSA execution statement should be included. Because petitioner had to sign the MSA execution statement to join the MSA, we find the execution statement to be an integral piece of the "MSA documents". Accordingly, we will use the term "MSA documents" to refer collectively to the following documents: the MSA, amendment 24, the MSA execution statement, the exclusive manufacturing and distribution agreement, and the General Tobacco adherence agreement.

_____

[6] Respondent's pretrial memorandum states: "The MSA Settlement Documents include: the MSA, Amendment No. 24 to the MSA, the General Tobacco Adherence Agreement, the Exclusive Manufacturing and Distribution Agreement, and the MSA Execution Statement." However, petitioner's brief states: "Petitioner concedes and agrees only that the Court apply Danielson and give effect to the clear and unambiguous terms of the 'MSA Documents' as defined herein." Petitioner then defines the MSA documents to include: the MSA, amendment 24, the exclusive manufacturing and distribution agreement, and the General Tobacco adherence agreement. The only difference between the two parties is with regard to the MSA execution statement.

C.     Arguments

Respondent contends Vibo voluntarily entered into the settlement with the settling States and should be bound by the MSA documents.  Consequently, respondent argues, the regulations prohibit Vibo from deducting the MSA payment obligations until it actually makes the payments.

Petitioner contends that Protabaco was the manufacturer participating in the MSA, because all the documents refer to Vibo as the importer and distributor (not the manufacturer) and to Protabaco as the manufacturer.  Consequently, petitioner argues, Vibo was simply assuming Protabaco's MSA payment obligations as a cost of purchasing cigarettes and the Code allows Vibo to deduct the MSA payment obligations as an ordinary and necessary business expense or cost of goods sold.

Before we can decide the tax consequences resulting under the MSA documents, we must discern the operative effect of the documents under Danielson.  We begin by determining Vibo's status under the MSA vis-a-vis its relationship to Protabaco.

III.     TPM, SPM, and Participating Manufacturer

        A.     Tobacco Product Manufacturer

The MSA defines a "tobacco product manufacturer" (TPM) as an entity that

after the MSA execution date directly (and not exclusively through any affiliate):

> (1) manufactures Cigarettes anywhere that such manufacturer intends
> to be sold in the States, including cigarettes intended to be sold in the
> States through an importer * * *;
>
> (2) is the first purchaser anywhere for resale in the States of cigarettes
> manufactured anywhere that the manufacturer does not intend to be
> sold in the States; or
>
> (3) becomes a successor of an entity described in subsection (1) or (2)
> above.

Amendment No. 24 to the MSA provides:

> In addition, and in consideration for the above, * * * [Vibo] shall be
> considered to be a * * * [TPM] and a Participating Manufacturer, and
> Protabaco shall not be considered to be a * * * [TPM].

Petitioner contends that Vibo was not a TPM under the original draft of the MSA,

and only TPMs were allowed to enter the MSA.  The parties agree Vibo was not

an actual manufacturer or fabricator of any cigarettes during the relevant periods.

However, amendment 24 classifies Vibo as a TPM and explicitly allows the

exclusive importer of foreign cigarettes to enter the MSA.

On brief petitioner quoted portions of section (A)(1) and (2) of amendment 24 to support his argument that Vibo is not a TPM. That section states, in part, that Vibo agrees and acknowledges (1) that it is the sole importer and distributor in the United States of all cigarettes manufactured by Protabaco, and (2) that Protabaco is the sole manufacturer of any cigarettes owned or licensed by Vibo or Protabaco. However, petitioner failed to include the portions of that section that cuts against his argument. Both parts end with the phrase, "subject to the terms of this Amendment." This phrase is important, because as quoted above, the amendment provides in section (B) that "[Vibo] shall be considered to be a * * * [TPM] and a Participating Manufacturer, and Protabaco shall not be considered to be a * * * [TPM]".

Petitioner also points to section (D) of amendment 24 to support his argument that Vibo is not a TPM. Section (D) states: "If * * * [Vibo] creates or acquires its own manufacturing facility, it shall assume all responsibilities as the * * * [TPM] of such Cigarettes under the MSA." Petitioner interprets this statement to mean that Vibo will be considered a TPM only if it creates or acquires its own manufacturing facilities. We disagree. We interpret the statement to mean that if Vibo creates or acquires its own manufacturing facility, Vibo will be considered the TPM of the cigarettes manufactured at the new facility. The

statement is not relevant to Vibo's TPM status with respect to the cigarettes Protabaco manufactured.

Finally, petitioner also relies on provisions in the exclusive manufacturing and distribution agreement to show that Vibo was not a manufacturer. First, petitioner points to the recitals, which describe Vibo as an "importer and distributer".[7] Second, he cites a portion of the agreement in which Vibo appoints Protabaco as its exclusive manufacturer, and Protabaco appoints Vibo as its exclusive importer. However, as we noted above, under amendment 24 an exclusive importer (Vibo) of cigarettes fabricated by another party (Protabaco) outside the United States could apply to participate in the MSA. Vibo's application to join the MSA was in fact submitted on that basis. Accordingly, we are not persuaded that Vibo was incapable of being a TPM under the MSA merely

---

[7]The three recitals as quoted on brief are as follows:

"WHEREAS, Protabaco has engaged in the business of <u>manufacturing</u> tobacco products ". (Emphasis added.)

"WHEREAS, * * * [Vibo] is a[n] * * * <u>importer and distributer</u> of cigarettes." (Emphasis added.)

"WHEREAS, Protabaco presently <u>manufactures</u> * * * [Vibo's] cigarettes * * * and * * * [Vibo] * * * purchases such cigarettes for distribution in the United States." (Emphasis added.)

because it did not actually manufacture cigarettes. We find that Vibo was a TPM under the MSA as it contractually agreed, and as the MSA permits by amendment.

B.    Legal Fiction

Petitioner contends that Vibo's position as a TPM is illusory, because amendment 24 deems Vibo a TPM merely to allow Vibo to assume Protabaco's MSA payment obligation. If amendment 24 had not deemed Vibo a TPM, then Vibo could not have joined the MSA. Petitioner argues that Vibo's TPM status is a legal fiction and that Vibo has actually agreed to make the MSA payments for Protabaco as part of Vibo's purchase price for cigarettes.

We reject petitioner's contention for two reasons. First, Protabaco did not sign any of the MSA documents except for the exclusive manufacturing and distribution agreement, which merely appointed Protabaco as Vibo's exclusive manufacturer. Second, as discussed infra, Vibo obligated itself under the MSA for its own liabilities; Protabaco had no MSA liability for Vibo to assume.

C.    Subsequent Participating Manufacturer and Participating Manufacturer

Respondent contends that Vibo not only became a TPM by entering the MSA, but it also became an SPM and a participating manufacturer as defined by

the MSA's terms. We agree. The first paragraph of the MSA execution statement provides:

> The undersigned authorized representative hereby executes the * * * [MSA], as amended (hereafter "Agreement") on behalf of * * * [Vibo] * * * thereby becoming a Subsequent Participating Manufacturer. * * * [Vibo] * * * and its authorized representatives agree to be bound by such Agreement and to fulfill all the obligations of a Participating Manufacturer under the Agreement, including, but not limited to, making all payments that it would have been obligated to make had it been a signatory as of the MSA execution date. [Emphasis added.]

Petitioner, as president of Vibo, signed this statement under oath. Also, amendment 24 specifically states: "[Vibo] shall be considered to be a * * * Participating Manufacturer".

The MSA defines a participating manufacturer as a TPM that is or becomes a signatory to the MSA, provided that: (1) in the case of a TPM that is not an OPM (e.g., in Vibo's case), that TPM is bound by the MSA in all settling States in which the MSA binds OPMs, and (2) in the case of a TPM that signs the MSA after the MSA execution date (e.g., also in Vibo's case), that TPM, within a reasonable time after signing the MSA, makes any payments that it would have been obligated to make in the intervening period had it been a signatory as of the MSA execution date.

By signing the MSA execution statement, Vibo agreed "to be bound by * * * [the MSA] and fulfill all the obligations of a participating manufacturer under the Agreement". The MSA binds Vibo in each settling State in which it binds the OPMs. Therefore, Vibo satisfies the first requirement.

Vibo signed the MSA after the MSA execution date of November 23, 1998, and made its first prior obligation installment payment in 2005 in accordance with the General Tobacco adherence agreement. Therefore, Vibo also satisfies the second requirement.

The MSA generally defines an SPM as a TPM that: (1) is a participating manufacturer, and (2) is a signatory to the MSA. As we noted above, Vibo has satisfied both of these requirements as well.

The General Tobacco adherence agreement and the exclusive manufacturing and distribution agreement further demonstrate that Vibo obligated itself under the MSA as an SPM. Although we do not accord "whereas clause" recitals the weight of operative terms in an agreement, they can aid interpretation of that agreement. See e.g., Grynberg v. FERC, 71 F.3d 413, 416 (D.C. Cir. 1995) ("[I]t is standard contract law that a Whereas clause, while sometimes useful as an aid to interpretation 'cannot create any right beyond those arising from the operative

terms of the document.'" (quoting Abraham Zion Corp. v. Lebow, 761 F.2d 93, 103 (2d Cir. 1985))).

In relevant part, the General Tobacco adherence agreement states: "WHEREAS, * * * [Vibo] wishes to become * * * [an SPM] under the * * * [MSA] * * * and filed its application therefor". Also in relevant part, the exclusive manufacturing and distribution agreement states: "WHEREAS, * * * [Vibo] has agreed to make a considerable long term investment wherein it has obligated itself * * * as * * * [an SPM], in order that it may become a signatory to the MSA".

Accordingly, we find that Vibo contractually obligated itself as an SPM and participating manufacturer and had the rights and obligations commensurate with that designation.

Having determined Vibo's status as a TPM, an SPM, and a participating manufacturer under the MSA documents, we next address petitioner's assumption of liability argument.

IV. Assumption of Liability

A. Arguments

Petitioner contends that Vibo entered into the MSA at Protabaco's request to make the MSA payments on behalf of Protabaco as part of Vibo's purchase

price for cigarettes.  Respondent argues that Protabaco had no liability under the MSA, so Vibo could not assume its liability.

B.    Whether Protabaco Has MSA Liability To Assume

1.    Pre-MSA Arrangement

Petitioner argues that Protabaco was liable for the MSA payments, because State laws required Protabaco to either join the MSA or contribute to the NPM escrow accounts.  Protabaco's name was on the NPM escrow accounts, but Vibo made the account contributions.  Petitioner argues this as evidence of an ongoing assumption of liability arrangement.

We agree that Protabaco had an obligation to either join the MSA or contribute to the NPM escrow accounts, of which it chose the latter.  We also agree that Vibo made the contributions to the NPM escrow accounts.  However, that does not mean Protabaco continued to be the liable party after Vibo entered into the MSA.  Once Protabaco chose the NPM route, it had no obligation to later join the MSA.  As we will discuss, we are not convinced that Protabaco forced Vibo to join the MSA.  We find that Vibo entered into the MSA voluntarily.

While it may have been possible for Protabaco to settle with the settling States and then pass on the MSA costs to Vibo in the form of increased prices, that did not happen.  Petitioner must be taxed in accordance with the transaction he and

Vibo consummated, not a transaction he might have consummated but did not. See Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148-149 (1974) ("[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not." (Citation omitted.)).

Moreover, nothing in the MSA documents creates any Protabaco liability that Vibo could assume. As discussed supra, the MSA documents clearly show that Vibo obligated itself to make the MSA payments. By signing and executing amendment 24, petitioner agreed that Vibo alone was liable for the MSA payments on its cigarettes regardless of the identity of the manufacturer.[8] Therefore, we find that Protabaco had no liability under the MSA for Vibo to assume.

Petitioner cites the General Tobacco adherence agreement as further evidence that Vibo assumed Protabaco's liability. Under that agreement, Vibo

_____

[8]See amend. 24, sec. A(3):

[Vibo] shall be responsible for all payments under the MSA for all Cigarettes manufactured by Protabaco * * *, as well as all Cigarettes sold under any Brand Name that is, or has been, or will be, owned or licensed by * * * [Vibo] * * * regardless of the identity of the manufacturer, including Cigarettes sold prior to the date of this Amendment.

received credit against its MSA payment obligations for a portion of the NPM escrow payments it made on behalf of Protabaco. Petitioner argues that this simply bridges the gap to continue the prior arrangement under which Vibo paid Protabaco's obligations.

Petitioner's argument does not convince us that Vibo assumed Protabaco's liability. Under the MSA, if a TPM joined the MSA more than 90 days after the MSA execution date (as Vibo did), it was required to make payments--known as the prior obligation--to the States that it would have been obligated to make had it joined the MSA in November 1998. Because the prior obligation relates to the same cigarettes for which Vibo made the NPM payments in those earlier years, and the effect of the payments to both the MSA and NPM escrow accounts was the same, it makes sense economically that Vibo would receive credit for its NPM escrow contributions. Nothing about the credit gives rise to the legal effect of an assumption-of-liability arrangement.

Moreover, the General Tobacco adherence agreement makes clear that Vibo alone is obligated to make the MSA payments--both prior and current. Nothing in the agreement suggests that Vibo agreed to undertake those obligations as part of its purchase of cigarettes from Protabaco. Protabaco was not even a signatory to that agreement, amendment 24, or the MSA execution statement. On these facts,

we find that Vibo did not assume Protabaco's MSA payment obligations as part of its purchase of cigarettes. Rather, Vibo's liability arose when it contractually agreed with the settling States to be obligated under the MSA.

### 2. Quarterly Report Requirement

The exclusive manufacturing and distribution agreement requires Vibo to provide reports to Protabaco regarding its payment of current MSA obligations and its ability to make future payments.[9] Petitioner argues that this arrangement indicates an assumption-of-liability arrangement between Vibo and Protabaco. We disagree, because other plausible explanations for the reporting requirement exist.

Protabaco has an interest in Vibo's ability to meet its MSA obligations regardless of whether Vibo assumed Protabaco's liability. If Vibo failed to make the necessary MSA payments, Vibo's cigarette brands would end up delisted and retailers would not stock their shelves with those brands. Therefore, Protabaco had a vested interest in ensuring that Vibo could make its MSA payments, because

---

[9]Under the heading "MSA Obligations", the agreement states: "[Vibo] agrees to provide Protabaco with: (i) a quarterly report setting forth in detail the amount necessary for * * * [Vibo] to have available to make its MSA payments due each quarter, and (ii) documentation reflecting * * * [Vibo's] quarterly deposit requirements pursuant to its MSA Adherence Agreement."

nonpayment could lead to Vibo's importing fewer (or no) cigarettes from Protabaco.

### 3. Reason for Entering Into the MSA

Petitioner contends that Vibo entered into the MSA on behalf of Protabaco at Protabaco's request. However, the evidence indicates that financial considerations led Vibo to enter into the MSA voluntarily.

The NPM escrow statutes, as originally enacted by the settling States, contained an unintended loophole that gave NPMs an unfair competitive advantage over TPMs participating in the MSA. Congress closed the loophole in 2004, and Vibo submitted its application that year.

The exclusive manufacturing and distribution agreement petitioner signed states: "[Vibo] has agreed to make a considerable long term investment wherein it has obligated itself to make payments to the States * * * in order that it may become a signatory to the MSA, with the expectation of gaining a considerable increase in market share for the * * * [Vibo] Cigarettes". (Emphasis added.)

In a Federal antitrust action, Vibo filed a verified amended complaint, arguing that the settling States' amendment of their escrow statutes made it increasingly difficult for Vibo to continue in business under the obligation of

making NPM contributions.[10]  The complaint also stated that Vibo came to understand that the only effective means to reach the national cigarette market was to join the MSA because most retail chains wanted the liability release afforded by the MSA to participating manufacturers and refused to carry Vibo products without it.  Vibo's vice president and general counsel, Mr. Denman, verified the complaint.

On cross-examination before this Court, Mr. Denman testified that the statements in the complaint were accurate but that Vibo ultimately entered into the MSA "because Protabaco gave * * * [Vibo] no alternative."  This testimony without more does not outweigh the evidence that Vibo voluntarily entered into the MSA after carefully considering the financial impact of its decision.

Petitioner did not offer testimony from any Protabaco representatives to corroborate Mr. Denman's statements.  The failure to call a representative of Protabaco at trial gives rise to the adverse inference that had such a witness been produced, his or her testimony would not support petitioner's contentions.  See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947).  Vibo had significant business reasons for joining

---

[10]Verified Amended Complaint at 53, Vibo Corp. v. Conway, 594 F. Supp. 2d 758 (W.D. Ky. 2009), aff'd, 669 F.3d 675 (6th Cir. 2012).

the MSA, and Mr. Denman's self-serving testimony alone does not convince us that Protabaco forced Vibo to join. See Broz v. Commissioner, 137 T.C. 46, 59 (2011) ("We need not accept the taxpayer's self-serving testimony when the taxpayer fails to present corroborative evidence."); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Accordingly, we reject petitioner's argument that Vibo entered into the MSA at Protabaco's request.

V.   Deductions

A.   The Law

Section 162(a) allows taxpayers to deduct all ordinary and necessary business expenses they pay or incur during the taxable year in carrying on any trade or business. Section 461(a) provides that any deduction "shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." During the years at issue, Vibo was an accrual method taxpayer. Under the accrual method of accounting, taxpayers record liabilities as they are incurred. A taxpayer incurs a liability in the taxable year in which (1) all the events have occurred that establish the fact of the liability, (2) the amount of the liability can be determined with reasonable accuracy, and (3)

economic performance has occurred with respect to the liability. Sec. 1.461-1(a)(2), Income Tax Regs.; see sec. 461(h)(1), (4).

Conditions (1) and (2) together compose what is known as the "all events" test. Sec. 461(h)(4). Section 461(h)(1) modifies the all events test, providing that "the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs." Therefore, we must first determine if and when economic performance occurred. If petitioner failed to satisfy the economic performance requirement, we need not address the all events test.

B.      Economic Performance

Section 461(h)(2) determines the timing of economic performance according to the source of the liability. The parties disagree over the source of the MSA payment obligation. Petitioner argues that the obligation arose from the provision of property to Vibo from another person (Protabaco) and therefore economic performance occurred as Protabaco provided cigarettes to Vibo. See sec. 461(h)(2)(A)(ii). Respondent argues that Vibo was required to make the MSA payments to a qualified settlement fund (QSF), and therefore economic performance does not occur until Vibo actually makes the payments. See sec. 468B(a) ("For purposes of section 461(h), economic performance shall be deemed

to occur as qualified payments are made by the taxpayer to a designated settlement fund."); sec. 1.468B-3(c)(1), Income Tax Regs.

### 1. Property Provided to Vibo

As stated above, we are not convinced that Vibo made the MSA payments on behalf of Protabaco as a cost of purchasing manufactured cigarettes. Therefore, we do not apply section 461(h)(2)(A), because it determines the timing of economic performance only when the liability arises from services or property provided to the taxpayer.

Petitioner argues that although a QSF received Vibo's payments, and despite section 468B(a), we should focus our inquiry on what the payment was for and not necessarily to whom it was made. In his view, the QSF is nothing more than a straw man. Petitioner relies on two items to make his argument: (1) Priv. Ltr. Rul. 9852037 (Dec. 25, 1998), which ignored the fact that a taxpayer was making payments to a QSF, and (2) IES Indus., Inc. v. United States, 253 F.3d 350 (8th Cir. 2001).

A private letter ruling (PLR) can be relied upon only by the taxpayer to whom the ruling is addressed; however, "rulings do reveal the interpretation put upon the statute by the agency charged with the responsibility of administering the revenue laws." Hanover Bank v. Commissioner, 369 U.S. 672, 686 (1962). The

Internal Revenue Service limited its ruling in Priv. Ltr. Rul. 9852037 to the specific facts and circumstances of that case, and the facts in that ruling bear no resemblance to the facts before this Court. Accordingly, Priv. Ltr. Rul. 9852037 has no value in this proceeding.

Petitioner cites IES Indus. as an example of an accrual basis taxpayer properly deducting a payment to the Government when accrued and not when paid because the payment was deemed to be for the provision of services. However, IES Indus. is distinguishable from this case.

In IES Indus., the payment obligation arose out of the provision of services to the taxpayer. The U.S. Government provided uranium enrichment services to the taxpayer. The taxpayer then made payments into a fund for the decontamination and decommissioning of uranium enrichment plants. The extent of the taxpayer's use of the uranium enrichment services determined the amounts of the payments.

Petitioner equates the payments in IES Indus. with the payments here, because both arose from the taxpayers' receipt of services or property. Petitioner argues that the MSA payment obligations arose out of Protabaco's provision of cigarettes to Vibo, and IES' obligations arose out of the Government's provision of uranium enrichment services to IES. Section 461(h)(2)(A) fixes the timing of

economic performance for liabilities arising from the provision of both services and property.  Thus, petitioner argues that we should find IES Indus. instructive on why economic performance occurred here when Vibo received the cigarettes.  We do not agree.

In IES Indus., the taxpayer's obligation depended on the amount of uranium enrichment services the taxpayer received.  The U.S. Government provided the services and assessed payment obligations based on the extent of the services IES used.  Here the MSA calculated a current obligation based on Vibo's share of the cigarette market, not the number of cigarettes Vibo received.  Similarly, the MSA calculated a prior obligation based on the Federal excise taxes that Vibo had paid for cigarettes sold in the U.S. before joining the MSA.  Protabaco could have provided an infinite number of cigarettes to Vibo, but without subsequent sales Vibo would have owed nothing to the MSA.  The facts in IES Indus. also differ from those here in that IES was not making payments into a QSF.

The Code and the regulations contain specific rules for determining the timing of economic performance for payments made to QSFs.  We discuss the effect of those rules below.

### 2. Qualified Settlement Fund

The parties have stipulated that the MSA escrow account is a QSF for Federal tax purposes. Section 1.468B-3(c), Income Tax Regs., provides that "economic performance occurs with respect to a liability described in § 1.468B-1(c)(2) * * * to the extent the transferor makes a transfer to a * * * [QSF] to resolve or satisfy the liability." Section 1.468B-1(c)(2), Income Tax Regs., describes several types of liabilities for which a QSF can be established, including those arising out of tort, breach of contract, or violation of law.

### 3. Tort, Breach of Contract, or Violation of Law

Respondent argues that Vibo's MSA payment obligation arose out of claims asserting liability for tort, breach of contract, or violation of law and that section 1.468B-1(c)(2), Income Tax Regs., should accordingly apply. Petitioner disagrees, because Vibo has not engaged in tortious conduct and has never been sued for injuries with respect to its tobacco products by the attorney general of any State that is a party to the MSA. Petitioner's argument fails, because nothing in the regulation requires a claim to have been brought against Vibo specifically. It simply requires that the fund be established for the satisfaction of claims that may result from an event that has occurred and given rise to a claim asserting liability arising out of tort or violation of law.

The MSA was made by the settling States' representatives and the participating manufacturers "to settle and resolve with finality all Released Claims against the Participating Manufacturers and related entities as set forth * * * [therein]." The very first recital of the MSA states that more than 40 States have commenced litigation asserting various claims for monetary, equitable, and injunctive relief against certain TPMs and others as defendants. The second recital explains that those States sought to obtain equitable relief and damages under State laws, including consumer protection and/or antitrust laws. The final recital says the settling States and the participating manufacturers wish to avoid the further expense and burden of continued litigation and have agreed to settle their respective lawsuits and potential claims. The MSA further states that in consideration of the payments made by the participating manufacturers and the release and discharge of all claims by the settling States, the parties enter into and memorialize the agreement.

Section XVIII(d) of the MSA, titled "Payments in Settlement", provides as follows:

> All payments to be made by the Participating Manufacturers pursuant to this Agreement are in settlement of all of the Settling States' antitrust, consumer protection, common law negligence, statutory, common law and equitable claims for monetary, restitutionary, equitable and injunctive relief alleged by the Settling States with

respect to the year of payment or earlier years * * * *. [Emphasis added.]

Under <u>Danielson</u>, we must give great weight to the explicit and unambiguous terms of the MSA documents in determining the tax consequences of this arrangement. The explicit and unambiguous terms of the MSA documents indicate that the fund was established to satisfy claims that may result from an event that has occurred and given rise to a claim asserting liability arising out of tort or violation of law. Consequently, under section 1.468B-3(c)(1), Income Tax Regs., economic performance with respect to the MSA obligation could not occur until Vibo transferred funds to the QSF.

### C. Cost of Goods Sold Deductions

On its 2004 Form 1120S, Vibo deducted $295,549,083 of its MSA payment obligations--both prior and current--as part of its cost of goods sold. None of this amount was actually paid into the QSF in 2004, so economic performance did not occur. Thus petitioner improperly deducted the expenses, and we sustain respondent's disallowance of this deduction.

On its 2006 Form 1120S, Vibo deducted $108,487,225 of its MSA current obligation as part of its cost of goods sold. In 2006 Vibo paid $97,637,716 of its MSA current obligation. Therefore, only $97,637,716 of its deduction was proper.

D.   Interest Deductions

Petitioner argues that Vibo is entitled to deduct all interest that accrued on the MSA liabilities.  Petitioner specifically argues for two interest deductions:  (1) the $4,661,190 claimed on Vibo's 2004 Form 1120S, and (2) an additional $6,164,475 deduction for interest that accrued on the prior obligation but was included in the principal portion of the prior obligation under the General Tobacco adherence agreement.

Petitioner argues that section 461(h)(2) does not specifically address interest, so section 461(h)(2)(D), labeled "other items", controls.  Section 461(h)(2)(D) provides that in the case of any other liability not addressed in section 461(h)(2), economic performance occurs at the time determined under the regulations.  Petitioner then cites section 1.461-4(e), Income Tax Regs., which states:  "In the case of interest, economic performance occurs as the interest cost economically accrues, in accordance with the principles of relevant provisions in the Code."

1.   Claimed Interest Deduction

On its 2004 Form 1120S Vibo deducted $4,661,190 as interest accrued on its unpaid prior obligation for July 1 through December 31, 2004.  Respondent determined that Vibo deducted the expense prematurely and denied the deduction.

The issue here is whether economic performance occurred with respect to Vibo's accrued interest on the prior obligation by the time Vibo deducted it on its 2004 return. Petitioner argues that it did and cites section 1.461-4(e), Income Tax Regs., which provides that economic performance occurs for interest "as the interest cost economically accrues". However, section 468B(a) provides that economic performance occurs for obligations to a QSF when the taxpayer makes the payments. The expense Vibo deducted here was both interest and an obligation to a QSF, so we must determine which of the conflicting rules applies. We hold that section 468B(a) controls the timing of economic performance for all obligations to a QSF, including interest.

The Congress and the Treasury, acting on Congress' instruction, have provided comprehensive rules concerning taxpayers' payments to settlement funds. Those rules prevail over more general rules that might otherwise govern the payments. See Fourco Glass Co. v. Transmirra Prod. Corp., 353 U.S. 222, 228-229 (1957); D. Ginsberg & Sons, Inc. v. Popkin, 285 U.S. 204, 208 (1932) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling."). Under the specialized rules, economic performance occurs with respect to payments made to a settlement fund when the taxpayer makes the payments. The rules do not differentiate between interest and

principal, and we accordingly afford them equal treatment. Vibo did not make the interest payment on the prior obligation until 2005, and thus, his 2004 deduction was premature. Accordingly, we sustain respondent's denial.

### 2.    New Additional Interest Deduction

Petitioner raised a new argument on brief. He argues that Vibo is entitled to an additional interest deduction of $6,164,475. He claims that figure represents the amount of accrued interest included in the $239,018,305 prior obligation owed through June 30, 2004. Petitioner claims that PwC, the internal auditor, determined the interest amount, but he has failed to produce any evidence to support this claim. The record contains a letter from PwC, but the letter does not support petitioner's contention. The letter includes the $4,661,190 interest calculation on the current obligation, but it does not mention anything about accrued interest on the prior obligation.

Petitioner has provided no evidence that the initial prior obligation included any accrued interest. Because the record is devoid of any such evidence, petitioner raises this new issue untimely. Accordingly, we follow our well-settled rule that issues raised for the first time on brief will not be considered when doing so would prevent the opposing party from presenting evidence that might have

been presented if the issue had been timely raised. DiLeo v. Commissioner, 96 T.C. 858, 891 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).

E. Other Deduction

On its 2004 Form 1120S Vibo deducted $2,011,446 under "Other Deductions" for MSA obligations. That $2,011,446 was part of the current obligation Vibo deducted in 2004 but did not pay. In accordance with our findings above, the $2,011,446 is not deductible for 2004, because Vibo did not actually make the payments.

VI. Petitioner's Individual Income Tax Adjustment

Section 1366(a) provides, generally, that income, losses, deductions, and credits are passed through pro rata to shareholders on their individual income tax returns. As a result of the above findings, certain adjustments must be made to petitioner's 2004 and 2006 Forms 1040.

Petitioner restricted his arguments to tax consequences at the S corporation level; he did not argue that the determinations would still be in error in the event we found economic performance occurred at the time payment was made into the QSF. Because respondent's determinations in the notice of deficiency are

presumed correct and petitioner did not prove they were in error, we sustain those determinations.[11]

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

> Decision will be entered for respondent as to the deficiency and for petitioner as to the accuracy-related penalty under section 6662(a).

---

[11]Because respondent's determinations have been sustained, pursuant to the amendment to answer filed with this Court on January 11, 2013, petitioner's taxable income for the 2004 tax year also shall be increased by an additional $2,491,164, resulting in an increase to the deficiency of $871,907 for petitioner's 2004 taxable year.